Merrimack
No. 93-341

THE STATE OF NEW HAMPSHIRE

v.

BRUCE NEWCOMB

August 1, 1995

*Jeffrey R. Howard*, attorney general (*Cynthia L. White*, assistant attorney general, on the brief and orally), for the State.

*Judith M. Kasper*, assistant appellate defender, of Concord, and *Tower, Bean & Crocker*, of Jaffrey (*Ms. Kasper* and *Jefferson K. Allen* on the brief, and *Mr. Allen* orally), for the defendant.

BATCHELDER, J. The defendant, Bruce Newcomb, was convicted of two counts of first degree murder after a jury trial in Superior Court (*Manias*, J.). On appeal he argues that the trial court erred in admitting evidence of a subsequent armed robbery committed by the defendant; in improperly instructing on the use of the evidence of the defendant's other crimes; in refusing to instruct the jury that a witness's prior inconsistent statement could be used substantively; and in improperly instructing the jury on circumstantial evidence. He also argues that he was denied the effective assistance of counsel. We affirm.

In the early morning hours of August 4, 1991, Herbie Flanders and Audrey Whitten were shot to death in their Warner home. The murders followed a small party held there, at which the defendant had been present. Prior to the murders, the defendant had been threatening Flanders because Flanders had provided information to

the police incriminating the defendant in the theft of a truck. Charged with the felony of receiving stolen property, the defendant told several friends that he was going to "get" Flanders for informing on him, saying that Flanders was "going to die" and that the defendant would kill him. Hours before the murders, the defendant stated to friends that "Herbie's all taken care of," and that when they read in the newspaper that something bad had happened, they would know who had done it.

Discharged bullets and casings found at the scene came from a .380 caliber weapon. The defendant had bought a .380 Llama semi-automatic pistol on July 15, 1991, and was target-shooting in a Warner sandpit in July. On July 28, he fired it during an attempted armed robbery at a Dunkin' Donuts in Somerville, Massachusetts. Ballistics testing of the evidence recovered at the murder scene showed that it matched the bullets and casings previously fired from the defendant's gun. The gun was not recovered.

The defendant was indicted in Massachusetts for an armed robbery committed on August 5, the day after the murders, at the Lil' Peach Convenience Store in Somerville. The State sought to introduce evidence of the robbery at the defendant's murder trial in order to establish identity and opportunity, arguing that the robbery evidence showed the defendant's subsequent possession of the murder weapon. After a hearing during which eyewitnesses to the robbery testified and a security videotape of the actual robbery was played, the trial court ruled the evidence admissible. At trial, when the evidence of the robbery was introduced and again during its final charge, the court gave the jury a limiting instruction on the use of the robbery evidence.

■ The defendant first argues that the trial court abused its discretion in allowing evidence of the Lil' Peach robbery to be admitted pursuant to New Hampshire Rule of Evidence 404(b).

> Evidence of other bad acts is only admissible if relevant for a purpose other than to prove the defendant's character or disposition, if there is clear proof the defendant committed the other acts, and if the prejudice to the defendant does not substantially outweigh the probative value of the evidence.

*State v. Kirsch*, 139 N.H. 647, 653, 662 A.2d 937, 942 (1995). The defendant challenges only the second prong of this test for admissibility, contending that the State failed to show "clear proof" that the gun used in the robbery was the defendant's .380 Llama pistol. Assuming, without deciding, that the State's burden was to establish

clear proof of the identity of the firearm used in the robbery, *but see State v. Michaud*, 135 N.H. 723, 727, 610 A.2d 354, 356 (1992) (test requires proof "firmly establishing that the defendant, and not some other person, committed the [other] bad act"), we find that this burden was met.

The trial court found clear proof that the defendant committed the Lil' Peach robbery and, further, clear proof that the gun used in the robbery was the defendant's .380 Llama pistol. The defendant does not challenge the former finding, and the record supports the latter.

Evidence at the hearing showed that the defendant owned a black .380 Llama semi-automatic pistol, purchased in July 1991, that was the same as one purchased by the State and introduced for demonstrative purposes. Mark Ruff, the defendant's friend, testified about his familiarity with the defendant's gun and that the defendant had it with him on the evening of the murders. He stated that at the party at the Flanders home, he heard the defendant say that he was "gonna do it" while making a clicking sound like the hammer of a gun in his pocket. Ruff testified that the State-purchased black pistol resembled the defendant's gun.

Employees of the Lil' Peach store who witnessed the robbery also testified at the hearing. Carl Davis, who stood about five feet away from the robber, described a black gun with a silver chamber on top. The .380 Llama, purchased by the State, is all black except for a silver cartridge ejection port. Examining the State-purchased Llama, Davis stated that the gun looked "basically the same." Shown diagrams of six different types of semi-automatic guns, Davis pointed out dissimilarities between the robber's gun and those displayed, until shown the .380 Llama, which he said was "[p]retty close to it from what I can remember."

Bruce Ambrose, behind the counter when the robbery occurred, observed a black semi-automatic handgun with a hammer, held by the robber near the countertop. Looking at the .380 Llama purchased by the State, Ambrose stated, "Yes, this does look like the weapon that could have been used at the time." Ambrose had prepared a drawing of the robber's gun in order to show the size of the barrel, and when the Llama was placed on it at the hearing, Ambrose observed that it "[a]lmost" looked as though he had traced it.

Although the defendant points to isolated portions of the witnesses' testimony in which they admitted to uncertainty, the standard for admissibility under Rule 404(b) is not proof beyond a reasonable doubt. *See generally State v. Gruber*, 132 N.H. 83, 89, 562 A.2d 156, 159-60 (1989) (evidence of cancelled checks, receipts and

telephone records established clear proof of defendant's prior relationship). Sufficient similarity between the weapon used in the robbery and a .380 Llama was established to support the trial court's finding that the robbery was committed by the defendant with the murder weapon.

■. With respect to the evidence that the defendant committed the two Massachusetts robberies, the defendant challenges the trial court's limiting instructions to the jury. He argues that the court erred in refusing to give his requested instruction that the jury should consider the evidence only for the limited purpose of determining the defendant's control over the Llama firearm. We disagree.

The trial court need not instruct the jury in the specific language requested by the defendant so long as the instructions adequately and accurately state the relevant law. *See State v. Dedrick*, 135 N.H. 502, 505, 607 A.2d 127, 129 (1992). Whether or not a particular instruction is necessary is a decision left to the sound discretion of the trial court. *State v. St. John*, 129 N.H. 1, 3, 523 A.2d 26, 28 (1986).

The trial court ruled that the evidence of the other robberies was relevant and admissible to prove the identity of the defendant as the person in possession of the murder weapon. In its charge to the jury, the court instructed:

> Now you have heard evidence that the defendant committed certain illegal acts that are not charged in the indictments. This evidence was admitted for certain limited purposes. . . .

> The evidence concerning the Dunkin' Donuts robbery was offered to prove the identity of the murder weapon and the defendant's possession of the murder weapon during that robbery. If you do not believe that the defendant committed the Dunkin' Donuts robbery, or if you do not believe that the defendant used the murder weapon during the Dunkin' Donuts robbery, then you must not consider this evidence for any purpose at all and you must ignore this evidence. If you believe that the defendant committed the Dunkin' Donuts robbery using the same gun that was used in the Flanders and Whitten murders, then you may use this evidence in deciding whether the defendant is the person who committed the crimes for which he stands charged.

> The evidence concerning the Lil' Peach Convenience Store robbery was offered to prove that the defendant had

possession of his 380 Llama handgun during that robbery on August 5th, 1991. If you do not believe that the defendant committed the Lil' Peach robbery, or if you do not believe that the defendant used his 380 Llama during the Lil' Peach robbery, then you must not consider this evidence for any purpose at all and you must ignore this evidence. If you believe that the defendant committed the Lil' Peach robbery using his 380 Llama, then you may use this evidence in deciding whether the defendant is the person who committed the crimes for which he now stands charged.

Keep in mind that you may not consider any of this evidence, that is . . . the Dunkin' Donuts robbery or the Lil' Peach robbery, as proof of the defendant's character or as proof that the defendant was disposed to commit the crimes charged. The defendant's character is not an issue in this case. Your duty is to decide whether the State has proven beyond a reasonable doubt the identity of the defendant as the person who committed the crimes charged as well as every other element of the crimes charged.

Jury instructions are to be assessed reasonably in their entirety. *State v. Brown*, 128 N.H. 606, 615, 517 A.2d 831, 837 (1986). We disagree with the defendant's complaint that this instruction allowed the jury to use the evidence "for any purpose in determining the defendant's guilt." Read as a whole, this instruction accurately conveyed to the jury that the robbery evidence could only be used to decide whether, in light of the defendant's possession of the murder weapon before and after the murder, the State had shown beyond a reasonable doubt the identity of the defendant as the murderer.

Moreover, we disagree with the defendant's contention that he was entitled to an instruction that the jury could use the evidence only "to see if he had control over the gun." The trial court admitted the evidence, as requested by the State, to show identity in that it tended to prove the defendant's possession of the murder weapon both before and after the murders. The defendant was not entitled to an instruction narrowing the use of the evidence as permitted by the trial court's ruling.

Next the defendant argues that the trial court erred in refusing to instruct the jury that prior inconsistent statements of witness Richard Bragdon could be considered substantively by the jury. According to the defendant, the trial court's refusal to so instruct the jury violated his federal constitutional right to due

process and his right to produce all favorable proofs under part I, article 15 of the New Hampshire Constitution. The New Hampshire Constitution is at least as protective as the Federal Constitution in this area, and we therefore decide this case under the State Constitution, employing federal cases to aid in our analysis. *See State v. Maya*, 126 N.H. 590, 594, 493 A.2d 1139, 1143 (1985).

The theory of the defense was that Brian Caron, another guest at the Flanders party, committed the murders. Caron, the defendant, and Mark Ruff went to the Flanders party together in Caron's truck. After several hours, Caron drove Ruff home in Caron's truck, having arranged with the defendant to come back for him. Neither Caron nor Ruff testified to hearing any shooting before they left the party.

Richard Bragdon, another party guest, was outside sitting in his car when he heard the sound of Caron's truck starting. He saw the truck's lights as it backed out and headed toward the highway. He testified that he then thought he heard five or six gunshots, and when he went back to the house, he saw both Flanders and Whitten shot to death.

On cross-examination Bragdon was asked about his deposition testimony in which he had stated he was unsure whether he had noticed the truck leaving before hearing gunfire. He was also confronted with a taped statement he had given to the police on the morning following the murders in which he had stated that the truck left after the shots. The trial court admitted the taped statement pursuant to New Hampshire Rule of Evidence 613(b) as a prior inconsistent statement so that the jury could "understand [its] impeaching weight and significance." The tape was played for the jury, and Bragdon acknowledged it to be his recorded statement. He explained that he had been awake for approximately twenty hours prior to the police interview and that he was in "severe shock" at the time over having seen his two friends dead. When he gave the statement, he testified, he had been sure of everything except "maybe that event," and had told the police that the truck left after the shots were fired because "it was just common sense that if the truck had left, that there wasn't any reason to hear shots . . . ." At trial, however, his memory was that the shots were fired after the truck had gone.

The trial court instructed the jury that it could use a witness's prior inconsistent statements in deciding whether to believe the witness's trial testimony but could not consider the statement as proof that the facts contained in the statement are true. Defense counsel objected to this instruction and asked for an instruction that

if the jury believed Bragdon's police statement to be true, it could "use that as a fact to reach their determination." The request was said to be based on the defendant's right to present all proofs favorable under the Federal and State Constitutions. The trial court declined to give the instruction.

The defendant concedes the evidentiary principle in New Hampshire courts "that inconsistent statements of a witness, not a party, made prior to trial may be used only to discredit his testimony, and are not to be treated as having any substantive or independent value." *State v. Gomes*, 116 N.H. 113, 114, 352 A.2d 713, 714 (1976). He argues, however, that admission of the Bragdon police statement for impeachment purposes alone violated his constitutional rights. We disagree.

A defendant has the right, under part I, article 15 of the State Constitution, to produce all proofs favorable to his defense. This, however, does not entitle him to introduce evidence in violation of rules of evidence. *Cf. State v. Taylor*, 118 N.H. 859, 861, 395 A.2d 1239, 1241 (1978). Bragdon's unsworn statement was hearsay, not admissible under any exception to the hearsay rule and therefore presumptively insufficiently reliable to be admitted for its truth. The circumstances surrounding the statement, as Bragdon's testimony indicates, do not demonstrate a basis for finding it trustworthy: he was in severe shock; he had been awake for twenty hours; and, in his own mind at the time he made the statement, it "was just common sense" that he would not have heard shots after the truck had departed.

The defendant argues that his rights to due process and favorable proof entitled him to substantive admission of the statement, relying on *Chambers v. Mississippi*, 410 U.S. 284 (1973). That case is inapposite to the facts here. There, the defendant was denied the opportunity to question adversely his own witness who, on cross-examination by the State, had repudiated a sworn confession to the murder for which the defendant was on trial. *Id.* at 291. In addition, the defendant was prohibited from introducing the testimony of three friends to whom the repudiating witness had admitted the murder. *Id.* at 292-93. The Court concluded that the defendant had been denied a fair trial by the exclusion of the witness's admissions to others and by the denial of an opportunity to cross-examine the witness. *Id.* at 302-03. The Court noted that the witness's admissions to his friends would have been admissible under the traditional hearsay exception for statements against penal interest as they were made "under circumstances that provided considerable assurance of their reliability," *id.* at 300; Mississippi, however, did not

recognize that exception, *id.* at 299. While finding that in the particular circumstances of his trial Chambers had been denied due process, the Court admonished that a defendant exercising his right to present witnesses in his own defense, like the State, "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id.* at 302.

As we have already noted, Bragdon's unsworn statement did not possess sufficient indicia of trustworthiness to fall within any hearsay exception and thus to be allowed full substantive admissibility. The trial court's decision to allow the statement only for impeachment did not deprive the defendant of favorable proof or due process.

The defendant next challenges the trial court's circumstantial evidence instruction to the jury. The court stated in its charge:

> Now there are two types of evidence, direct and circumstantial. Direct evidence is the testimony of a person who claims to have personal knowledge of facts about the crime charged such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances which tend to show whether the defendant is guilty or not guilty. There is no distinction between the weight to be given either direct or circumstantial evidence. However, to be sufficient to establish guilt beyond a reasonable doubt, circumstantial evidence must exclude all other rational conclusions. This means that if from the circumstantial evidence it is rational to arrive at two conclusions, one consistent with guilt and one consistent with innocence, then you must cho[o]se the rational conclusion consistent with innocence. You should consider all the evidence in this case, including the circumstantial evidence, and decide whether the State has proven the defendant guilty beyond a reasonable doubt.

■ This instruction accurately stated the law. The defendant complains that the trial court erred in refusing to add to this instruction that circumstantial evidence "must be viewed with caution," "be well connected to the evidence," and "must exclude every reasonable theory except the guilt of an individual." The defendant was not entitled to such an instruction.

Circumstantial evidence, to be sufficient to convict, must exclude all rational conclusions other than the guilt of the defendant in a case "where there is only circumstantial evidence to support the conviction." *State v. McCue*, 134 N.H. 94, 104, 589 A.2d 580, 586 (1991). This case contained not only circumstantial evidence but also

direct evidence in the form of the defendant's admissions to witnesses. The instruction he received was therefore arguably more than that to which he was entitled. Facts may be proved by circumstantial evidence, and "[t]he law makes no distinction between direct evidence of a fact and evidence of circumstances from which the existence of a fact may be inferred." *State v. Wayne Kelley*, 120 N.H. 14, 16, 413 A.2d 300, 302 (1980). The language the defendant requested—that circumstantial evidence be "well connected" and "viewed with caution"—is thus an inaccurate statement of the law. The trial court did not err in refusing to so instruct the jury.

Finally, the defendant contends that he was denied effective assistance of counsel by his trial counsel's failure to confront a witness, Brian Caron, with a statement he had made to Wendy Place, resulting in preclusion of Place's testimony under New Hampshire Rule of Evidence 613(b). At the time of trial, defense counsel moved for a mistrial or, in the alternative, to recall Caron to testify, as a remedy for the alleged ineffectiveness. A recess followed, during which the State and the defense reached an agreement that would permit the jury to hear similar evidence through another witness. When the trial resumed, the following colloquy occurred at the bench:

> The Court: Okay. Now your motion to recall Mr. Caron is withdrawn, is that it?
>
> Mr. Raimo: Yes.
>
> The Court: And your motion for a mistrial on the ineffective assistance of counsel claim is also withdrawn, is that correct?
>
> Mr. Raimo: The motion for the mistrial, yes, your Honor.
>
> The Court: What do you mean the motion for the mistrial is? That was the basis for it, wasn't it?
>
> Mr. Raimo: Yes, your Honor.
>
> The Court: Anything further?
>
> Mr. Raimo: The only thing I meant by that is I'm not withdrawing the suggestion that it was ineffective not to question the witness on the issue.

By withdrawing his request for relief for his counsel's alleged ineffectiveness, the defendant deprived the trial court of the opportunity to rule on the claim. We will not consider it for the first

time on appeal. *See State v. Devaney*, 139 N.H. 473, 476, 657 A.2d 832, 834 (1995).

*Affirmed.*

All concurred.