Hillsborough
Nos. 92-335
94-142

THE STATE OF NEW HAMPSHIRE

v.

WILLIAM SEYMOUR

March 19, 1996

*Jeffrey R. Howard,* attorney general (*John P. Kacavas,* assistant attorney general, on the brief and orally), for the State.

*Brennan, Caron, Lenehan & Iacopino,* of Manchester (*Michael J. Iacopino* and *Timothy I. Robinson* on the brief, and *Mr. Iacopino* orally), for the defendant.

BROCK, C.J. The defendant, William Seymour, was convicted on two indictments for first degree murder, *see* RSA 630:1-a (1986). Following his trial in Superior Court (*Barry,* J.), the defendant filed a motion for a new trial, alleging ineffective assistance of counsel, which was denied. He appeals his convictions as well as the denial of his motion for a new trial. We consolidated both appeals and now affirm.

In the early morning of Thursday, April 11, 1991, Arthur Miller was awakened in his Nashua apartment by the sound of screaming from the next door apartment. He recognized the voice of his neighbor, Tom Zimmerman, Sr., screaming, "Help me, Thomas. Help me." After hearing the sound of someone running into a wall, Miller heard nine-year-old Thomas, Zimmerman's son, scream, "Oh no, daddy," and then "a thump." After an hour and a half of silence, Miller heard Tom, Sr., say, "Please, Billy, leave me alone. I can't handle this no more." Then, between 5:00 and 5:30 a.m., Miller heard someone leave the Zimmerman apartment and walk out the front door.

Early Friday morning, April 12, Miller, concerned for the Zimmermans' well-being, called the Nashua police, who responded at 3:00 a.m. The bodies of Tom, Sr., and Thomas were then discovered: Tom, Sr., had suffered multiple cuts to the neck and a deep stab wound to the chest and a tie was tightly encircling his neck; nine-year-old Thomas had suffered multiple blows to the head and also had a tie tightly around his neck. From the apartment the police collected numerous items of evidence, including blood scrapings, blood-stained footwear impressions, and a block of knives from which one was missing.

Based on information learned from Miller, the police suspected the defendant. At 6:30 p.m. on April 12, the defendant telephoned the Nashua police after learning that a television news report had identified him as a suspect in the murders. He expressed a desire to speak to the police and went to the police station that evening, where he was advised of and waived his *Miranda* rights. He spoke with Detectives Hayes and MacDonald in what they characterized as a cooperative and relaxed manner. He claimed to have had no knowledge of the murders until that evening and provided an alibi for the relevant time frame. He admitted having known Tom, Sr.,

since 1982 and stated that he had lived at the victims' apartment for several weeks in March. Although he denied having any problem with Tom, Sr., the defendant admitted he had had a verbal confrontation with him at a bar over some money allegedly stolen from Tom, Sr.

During their hour-and-a-half-long conversation with the defendant, the detectives noticed scratches on his wrist, a cut on his finger, and that the tread on his sneaker sole was similar to the bloody footprints found at the scene. Based on these observations the detectives asked the defendant if he would consent to a search of his person and his apartment. Prior to reviewing the consent form with the defendant, the detectives explained to him that they wanted to look at his sneakers, his clothing, and his person, and that they wanted hair samples, nail clippings and fingerprints, as well as photographs. The detectives advised the defendant that they might want to keep the sneakers. Remaining cooperative, the defendant reviewed the consent form with the detectives and signed it. He then turned over his sneakers, which were soaking wet, and explained he had washed them after soiling them at work. Later examination of the sneakers revealed the presence of blood matching Tom, Sr.'s blood type and that the sneakers matched the impressions found at the scene. Laboratory analysis of the left sneaker demonstrated that its individual characteristics excluded the possibility that one of the impressions could have been made by any other sneaker.

The detectives collected the other physical evidence from the defendant's person, and in addition, a search warrant for the defendant's apartment was obtained. At 1:15 a.m., the defendant accompanied the police to his apartment. From the top of the defendant's bureau the police seized an "Armstrong Forge" knife with an eight-inch blade, similar to the knives found in the victims' apartment and consistent with the eight-inch-deep stab wound to Tom, Sr. A utility knife with a retractable blade, which appeared to be blood-stained, was found in the bathroom medicine cabinet; analysis of the substance revealed it to be Tom, Sr.'s blood. Also seized were the defendant's denim jacket, found to be stained with the blood of Tom, Sr., and a wooden threshold strip, found to be stained with his blood type. A pair of tan corduroy pants hidden under plastic in a drawer was seized; the fabric was consistent with a pattern bruise in the form of parallel lines on Tom, Sr.'s cheek.

The theories of defense at the defendant's trial for the murders were that the defendant had been framed by the actual perpetrator and, in the alternative, that he lacked the requisite mental state due to intoxication. The jury found him guilty of two counts of first degree murder.

On appeal, the defendant argues: (1) that the trial court's refusal to permit two witnesses to assert their privilege against self-incrimination in front of the jury, or to order grants of immunity to them once they invoked the privilege, violated the State and Federal Constitutions; (2) that the trial court abused its discretion in allowing the State to introduce certain photographs and video of the victims; (3) that the trial court erred in refusing to instruct the jury that mere presence at the scene of a crime is insufficient to make a person criminally responsible; (4) that he did not knowingly and voluntarily consent to a search of his sneakers, as required by the State and Federal Constitutions; (5) that the warrant authorizing a search of his residence was invalid; and (6) that his trial counsel rendered him ineffective assistance of counsel as guaranteed by both the State and Federal Constitutions.

The defendant first argues that the trial court erred in refusing, pursuant to New Hampshire Rule of Evidence 512, to permit two defense witnesses to assert their privilege against self-incrimination in front of the jury. According to the defendant, this refusal violated his right to produce favorable proofs under part I, article 15 of the State Constitution and his right to compulsory process under the sixth and fourteenth amendments of the Federal Constitution.

Prior to the defendant's trial, Garey Smith and Kittridge Smith, two defense witnesses, had pleaded guilty to the offense of receiving stolen property; namely, the victims' television set. At a pretrial hearing relative to their right to invoke their privileges against self-incrimination, *see State v. Richards*, 129 N.H. 669, 531 A.2d 338 (1987), both men asserted the privilege on several occasions during direct examination.

The defendant moved for permission to introduce into evidence the fact that the witnesses asserted the privilege, acknowledging that Rule of Evidence 512 prohibits comment on the subject. *See* N.H. R. Ev. 512(a) ("*Comment or Inference Not Permitted.* The claim of a privilege . . . is not a proper subject of comment by judge or counsel. No inference may be drawn therefrom."). Arguing that the witnesses' invocations of the privilege are "relevant and exculpatory," the defendant contended that he was entitled to present the invocations in front of the jury and that application of Rule 512 would be unconstitutional. The trial court, after hearing the testimony of Garey Smith and Kittridge Smith *in limine*, found that there was "no probative value which would benefit the defendant" and denied the motion.

We evaluate whether certain evidence constitutes favorable proof contemplated by the right guaranteed in part I, article 15 "by

considering the relevance of the evidence and its potential for confusing the issues or misleading the jury." *Opinion of the Justices (Certain Evidence in Sexual Assault Cases)*, 140 N.H. 22, 24, 662 A.2d 294, 295 (1995). A defendant has no absolute right to produce evidence that is not relevant to the issues being tried, *id.*; the right to produce favorable proofs does not entitle a defendant to introduce evidence in violation of the rules of evidence. *State v. Newcomb*, 140 N.H. 72, 79, 663 A.2d 613, 618 (1995).

To answer the question before us we need not decide whether a witness's invocation of the fifth amendment privilege can ever constitute favorable evidence in a criminal case. *But see Abbott v. Potter*, 125 N.H. 257, 261, 480 A.2d 118, 120 (1984); *United States v. Doddington*, 822 F.2d 818, 822 (8th Cir. 1987); *United States v. Johnson*, 488 F.2d 1206, 1211 (1st Cir. 1973). In this case the trial court found that the witnesses' assertions of the privilege had no probative value and thus would not be proof favorable to the defendant. The record supports this finding.

Garey Smith's invocation of the privilege came in the context of questioning with regard to theft or possession of stolen property belonging to the victim and drug-related activities. He expressly stated that he did not kill the victims and was not present when they were killed. Kittridge Smith invoked the privilege regarding his activities with Garey Smith at his apartment the night before the murders. He went on to state that the incriminating answers he refused to provide would relate to drug use. He also stated he was never in the victims' apartment.

In light of the witnesses' express denials relative to any involvement in the murders and the context of their invocations of the privilege, the record amply supports the trial court's determination that no probative evidence favorable to the defendant would derive from the witnesses' assertion of the privilege before the jury. A defendant has no constitutional right to present irrelevant evidence, *see Opinion of the Justices*, 140 N.H. at 24-25, 662 A.2d at 295, and "no right under part I, article 15 to introduce evidence that will have little effect other than to confuse the issues or confound the jury, for such evidence is not competent, favorable proof," *State v. Woodsum*, 137 N.H. 198, 201, 624 A.2d 1342, 1344 (1993).

Furthermore, the defendant's federal constitutional argument fails because the compulsory process clause of the sixth amendment "gives a defendant the right to produce witnesses, not their testimony." *State v. Roy*, 140 N.H. 478, 482, 668 A.2d 41, 44 (1995). The trial court did not abuse its discretion in refusing to

permit the witnesses' in-court invocations of their privilege against self-incrimination.

■ The defendant also argues with respect to witnesses Garey Smith and Kittridge Smith that the trial court erred in refusing to order grants of immunity in the face of their invocations of the privilege. He bases his argument on his federal and State constitutional rights to due process. We decide this question under the State Constitution independently. *See State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983). Because the defendant's federal constitutional protection in this area is no greater than that offered by the State Constitution, we make no separate federal analysis but decide the issue based solely on the New Hampshire Constitution. *See Roy*, 140 N.H. at 480, 668 A.2d at 43. This argument fails for the same reason as did the previous one.

Due process may, depending on the circumstances involved, be violated if a witness has not been given immunity where a defendant can show "that the testimony sought would be directly exculpatory or would present a highly material variance from the tenor of the State's evidence." *State v. Monsalve*, 133 N.H. 268, 270, 574 A.2d 1384, 1385 (1990). Here, the defendant has shown neither. He argues that Garey Smith and Kittridge Smith could have offered testimony concerning their involvement with the alleged victims' apartment that would have constituted a "highly material variance" from the State's case. This argument overlooks not only the denial by both witnesses of their having been in the apartment, but also the apparent inference from their assertions of the privilege that what they declined to testify about related to stolen property and drug use. The trial court did not err in refusing to order immunity.

The defendant next argues that the trial court abused its discretion in allowing the State to introduce certain photographs of the victims at the scene and during the autopsy, and portions of the crime scene videotape depicting the victims. Prior to trial, the defendant moved to exclude particular photographs and segments of the video that consisted of graphic pictures of the victims' faces and bodies taken at close range. To prevail on appeal the defendant must show that the trial court abused its discretion in admitting this evidence, that is, that the ruling was "clearly untenable or unreasonable to the prejudice of [his] case." *State v. Stayman*, 138 N.H. 397, 402, 640 A.2d 771, 774 (1994) (quotation omitted). We cannot find such an abuse of discretion here.

New Hampshire Rule of Evidence 403 provides in pertinent part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury . . . ." In his motion *in limine*, the defendant contended that the photographs and videotape evidence were of minimal probative value in view of the defense's willingness to stipulate to the cause and manner of death, namely, stabbing and ligature strangulation. Because of the proposed stipulation, the defendant maintained, the prejudice inherent in the gruesome depictions far exceeded their probative worth.

Cause and manner of death, however, were not the only issues to which the evidence pertained. Having charged the defendant with two counts of first degree murder, the State was required to prove beyond a reasonable doubt that the defendant's conscious object was to cause death and that he acted premeditatedly and deliberately to achieve that end. *See* RSA 630:1-a, I(a), II. In addition, to prove the lesser-included charge of second degree murder submitted to the jury, the State had to prove the defendant was aware that his actions would cause death or was aware of a substantial and unjustifiable risk of death. *See* RSA 630:1-b; RSA 626:2, II(b), (c) (1984). The defendant did not offer to stipulate to the mental element of these offenses. In fact, one alternative theory of defense was that the defendant, intoxicated at the time of the killings, was unable to form the requisite mental state to commit the offense. As defense counsel stated in closing argument to the jury:

> In this case, both for first degree murder and for the offense [of] second degree murder involving knowing conduct, you may consider, you have to consider evidence of intoxication in determining whether, assuming Bill committed these killings, he was acting purposely with deliberation and intent, whether he was acting knowingly with an awareness of what he was doing.
>
> . . . .
>
> If you get past the point and you decide that Bill caused these deaths and you go through the various culpable mental states, you may come down to the offense of second degree murder, which is knowingly causing death. Knowingly will be defined in the instruction. You know what knowingly m[e]ans. It means an awareness that death is occurring. And it's obvious, as I believe you people have already heard me say, that Bill did not know. That means not knowing of second-degree murder even if he did these killings.

■ The gruesome color photographs and videotape of the bloodied and strangled victims in this case were certainly prejudicial. The

refusal of the trial court to excise the most graphic of these depictions, as the defendant requested, presented a risk of unfair prejudice to the defendant. *Cf. Stayman,* 138 N.H. at 403, 640 A.2d at 774. When, as here, the prosecution is able to present diagrammatic and testimonial evidence about the nature of the crime scene and wounds inflicted, we would caution trial judges to give serious attention to defense requests to remove the most offensive and potentially inflammatory portions of the photographic and videographic evidence.

Our role on review, however, is to determine whether the trial court abused its discretion in weighing probative value and prejudice. *See id.* Graphic as the evidence was, it was clearly relevant to prove the defendant possessed the mental state that he so vigorously denied possessing. The condition of the bodies supports an inference concerning the amount of force used by the perpetrator, and "[e]vidence of degree of force is relevant because it tends to prove that the defendant acted with the requisite mental state." *State v. Walsh,* 139 N.H. 435, 437, 655 A.2d 912, 913 (1995). Because on the record before us we cannot say that the probative value of the evidence was *substantially* outweighed by the risk of unfair prejudice, *see* N.H. R. EV. 403, we hold that the trial court did not abuse its discretion in permitting its introduction.

■ The defendant also argues that a photograph of the victims together while alive should have been excluded as it was irrelevant. *See id.* In its argument at trial for the introduction of the photograph, the State maintained that it was admissible to allow the jury to identify the people who were the subjects of the murder prosecution. The defendant has not established that the trial court's decision to permit the introduction of the photograph was clearly untenable or unreasonable to the prejudice of his case, *see Stayman,* 138 N.H. at 402, 640 A.2d at 774, and thus has not demonstrated an abuse of discretion, *see id.*

■ The defendant next argues that the trial court erred in refusing to instruct the jury that mere presence at the scene of a crime is insufficient to make a person criminally responsible. *See State v. Goodwin,* 118 N.H. 862, 866, 395 A.2d 1234, 1236 (1978). A jury must be instructed adequately and accurately on the relevant law, and whether or not a particular instruction is necessary is left to the trial court's sound discretion. *Newcomb,* 140 N.H. at 76, 663 A.2d at 616.

As noted above, the defendant's theories of defense were that he was not present when the murders were committed but rather had been framed by the actual perpetrator and, in the alternative, that

he was not responsible because he was intoxicated. Neither of these theories, nor the evidence offered to support them, warranted an instruction that proof of his mere presence at the scene was not sufficient for criminal responsibility.

In *Goodwin*, on which the defendant relied, the defendant was charged as an accomplice, and his defense was that he was merely present at the scene of the kidnapping and sexual assault. *Goodwin*, 118 N.H. at 866, 395 A.2d at 1236. Nothing in the defenses proffered here suggested that this defendant, charged as the principal and sole perpetrator, similarly claimed to have been a mere bystander who did not facilitate the commission of the murders. *Cf. id.* at 866-67, 395 A.2d at 1237 (although evidence showed defendant took no particularly aggressive actions against victim, jury could find defendant aided principal in committing crimes).

■ The trial court instructed the jury that "the state must prove, first, that the defendant caused the death of another person — this means that the death of another person was the direct result of the defendant's actions — and, second, that the defendant did so purposely." The court went on to define premeditation and deliberation, and instructed on second degree murder and its requirements of direct causation and knowing or reckless conduct. To the extent there was any question about the defendant's mere presence at the scene, these instructions were adequate to convey to the jurors their obligation to acquit if mere presence were all that had been proved. Accordingly, we find no abuse of discretion in the trial court's refusing the "mere presence" instruction.

Next the defendant argues that the trial court erred in not providing the defendant's requested "mere presence" instruction in response to a question from the jury. The jury sent out the following question to the trial court during deliberations: "If someone partakes in part of the crime but not the final act, *i.e.*, strangulation, are they guilty?" Defense counsel asked the trial court to include in its answer to the jury the bulk of the defendant's requested "mere presence" instruction. The trial court denied the defense request and responded to the jury's question as follows:

> One of the elements of the crime of first degree murder is that the defendant caused the death of another. A legal cause of death is a cause which is a direct and substantial factor in bringing about the death. . . . It must be more than a mere possible cause or a contributing cause; the cause must be a direct and substantial factor in bringing about the death. Actions are the legal cause of an event if they are a direct and substantial factor in bringing the

event about. In other words, a legal cause is the cause without which the event would not have occurred, and the predominating cause, a substantial factor from which the event follows as a natural, direct and immediate consequence. To be the legal cause, the defendant's acts do not have to be the last acts of cause. Rather, the state must prove beyond a reasonable doubt only that the defendant's conduct substantially and materially contributed in a natural and continuous sequence, unbroken by a superseding intervening cause. Because there can be more than one cause of death, the state does not have to prove that the defendant's conduct was the sole cause of the victim's death. However, the state does have to prove beyond a reasonable doubt that the death was a direct result of the defendant's actions.

"We evaluate a claim that the trial court refused to answer a jury question in language requested by the defendant in the context of the entire charge and all of the evidence." *State v. McLellan*, 139 N.H. 132, 137, 649 A.2d 843, 846 (1994) (quotation omitted). It is within the trial court's discretion to decide how best to aid the jury in its deliberations; the court has no obligation to answer the jury's question with the specific language requested by the defendant. *Id.* at 138, 649 A.2d at 846.

■ We agree with the trial court's interpretation of the jury's question as an inquiry about causation. The question did not implicate the defendant's "mere presence" at the scene, as the defendant argued, but was premised on the defendant's active participation. It was plainly the level of the defendant's participation about which the jury sought guidance.

The trial court's supplementary instruction, in the context of the record and the entire charge, accurately conveyed to the jury the State's burden to prove the defendant's direct causal involvement in bringing about the deaths of the victims, while requiring the jury to acquit the defendant if his action was "a mere possible cause or a contributing cause" or less than "a direct and substantial factor in bringing about the death." This supplementary instruction "was unambiguous, legally correct and, in light of the clarity and specificity of the jury's question, entirely appropriate." *State v. Bundy*, 130 N.H. 382, 384, 539 A.2d 713, 714 (1988). We find no abuse of discretion.

The defendant's remaining arguments in his direct appeal require little discussion. He argues that the seizure of his sneakers violated his rights under part I, article 19 of the State Constitution and the

fourth and fourteenth amendments to the Federal Constitution in that he did not knowingly and voluntarily consent to the seizure. We decide this issue under the State Constitution, which provides at least as much protection as its federal counterpart. *See State v. Green*, 133 N.H. 249, 260, 575 A.2d 1308, 1315 (1993).

 Voluntariness of consent to a search is a question of fact for the trial court based on the totality of the circumstances. *See State v. Hastings*, 137 N.H. 601, 606, 631 A.2d 526, 530 (1993). When sufficient support appears in the record for the trial court's voluntariness determination, it will not be overturned. *Id.* at 606-07, 631 A.2d at 530. Here, the record plainly demonstrates that, prior to signing the consent form, the defendant was advised by Detective MacDonald that the requested search of his person included a search of his sneakers. Asked if he was willing to consent to a search of his person and premises, the defendant responded, "Sure. Why not?" He handed over his sneakers when asked and had no objection when Detective MacDonald asked to take one out of the room to show it to another officer. That the consent form itself was silent with respect to a search of the sneakers in particular is of no moment, as the totality of the circumstances shows the defendant knowingly and voluntarily consented to the search.

The defendant also challenges the validity of the warrant authorizing a search of his residence. The consent form that he signed prior to the officers' application for the search warrant, however, expressly granted his authorization "to conduct a complete search of my (premises) . . . situate at Clinton St. Tavern #35." This consent the defendant does not challenge on appeal, and as it provides sufficient independent justification for the search, we do not address the attack on the warrant.

Finally we turn to the defendant's argument that he was denied the effective assistance of trial counsel as guaranteed by part I, article 15 of the State Constitution and the sixth and fourteenth amendments of the Federal Constitution. We analyze his claim independently under the State Constitution, *see Ball*, 124 N.H. at 231, 471 A.2d at 350, and as our constitution provides at least as much protection as does the sixth amendment, we make no separate federal analysis. *State v. LaForest*, 140 N.H. 286, 292, 665 A.2d 1083, 1087 (1995).

To prevail on a claim of ineffective assistance of counsel, a defendant "must demonstrate that his counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *State v. Sanchez*, 140 N.H. 162, 163, 663 A.2d 629, 630 (1995) (quotation

omitted). To meet our familiar two-pronged test, the defendant must show deficient performance by trial counsel, in that counsel made such egregious errors that failed to function as the counsel that both constitutions guarantee, and that the deficient performance resulted in actual prejudice such that there is a reasonable probability of a different outcome absent counsel's deficient performance. *LaForest*, 140 N.H. at 292, 665 A.2d at 1088. When a defendant, as here, alleges he was deprived of effective counsel from the cumulative effect of several errors, "we find it helpful to address the merits of each claim of error, and consider the issue of prejudice only if there is a legitimate question as to whether counsel's conduct was indeed deficient." *State v. Wisowaty*, 137 N.H. 298, 302, 627 A.2d 572, 575 (1993).

The first error alleged by the defendant was counsel's failure to argue that the defendant's consent to search was coerced. At the hearing on his motion for a new trial, the defendant contended that the police told him that if he did not sign the form, they would hold him for seventy-two hours and "as a result of booking search [him] anyway." He testified that he told one of his attorneys about this shortly after being arrested. Both of the defendant's attorneys testified at the hearing. Attorney Schulman, who prepared the motion to suppress, stated that the defendant "never said any such thing to us at the time," and that he went over an outline of the motion with the defendant initially. Before the forty-two-page suppression motion containing everything Attorney Schulman "thought . . . was non-frivolous" was filed, the defendant reviewed it, agreed with it, and signed the accompanying affidavit.

The trial court in its order on the motion for a new trial noted the conflict in testimony: "The defendant himself admitted he reviewed the suppression motion and approved it, yet it did not raise this issue. The Court finds that the defendant has failed to prove that his trial counsel improperly handled the issue of coercion." Implicit in this conclusion is a finding that the defendant's version of events was not credible. "We will not overturn the credibility ruling of the factfinder, who is in the best position to make such a determination . . . ." *State v. Chase*, 135 N.H. 209, 215, 600 A.2d 931, 935 (1991). The record supports the trial court's finding that trial counsel's performance with respect to this alleged error was not deficient.

The second area in which the defendant complains his counsel's performance was deficient concerns his attorneys' decision not to investigate statements made by two putative witnesses. Two men had reported to the police that they had had a conversation

with an unidentified third party on the day the victims' bodies were discovered. The third party claimed that a friend had witnessed the murders. According to one of the men, the third party referred to his friend as Arthur. Defense counsel testified that they were aware of these statements but chose not to investigate them because: a large amount of information about the murders was already available in the press and in the neighborhood of the murders; the third party was unknown to the witnesses; and counsel were aware that a neighbor of the victims, Arthur Miller, had heard the struggle preceding the murders and peeked into the victims' apartment when the police arrived. Attorney Lange, who testified that he had defended approximately fifty homicides, stated that investigating these putative witnesses was "definitely talked about." We agree with the trial court's finding that "counsel could reasonably conclude that a search for the unidentified man and his friend 'Arthur' would only lead back to Arthur Miller, who was already identified as an important witness." The defendant has failed to demonstrate deficient performance in his attorneys' tactical decision.

The defendant argues that trial counsel was ineffective in failing to procure the services of an expert witness on the subject of the rate at which blood dries and an expert on alcohol absorption. Both potential witnesses, according to the defendant, would have been relevant to the time of death. The medical examiner established the time of death as between midnight and noon on April 11. Because the defendant had presented evidence that he could not have committed the crimes if they occurred after 7:00 a.m. on April 11, his theory was that the wet pools of blood observed on April 12 suggested a later time of death within the range.

On cross-examination of the detective who collected evidence at the victims' apartment, defendant's counsel elicited evidence that towels retrieved from the crime scene as late as the afternoon of April 12 were still obviously saturated with blood. During closing argument defense counsel referred to the presence of wet blood in arguing for a time of death later than the time for which the defendant had an alibi.

At the hearing on the motion for a new trial, defense counsel stated he was not aware of whether there are so-called experts on "blood drying times." The defendant did not suggest that such experts existed or were available or would have provided evidence favorable to him. In these circumstances, and in light of defense counsel's development of the time-of-death theory through other witnesses, the defendant has not shown that his counsel's performance was not adequate in this area.

As for the subject of the rate of alcohol absorption, counsel testified that the decision not to employ an independent expert was based in part on the absence of information about the amount of alcohol Tom, Sr. had consumed prior to his death and at what intervals; the witnesses' statements in this regard were conflicting. Nonetheless, at trial, defense counsel devoted considerable effort to establishing a later time of death from the absence at that time of alcohol in Tom, Sr.'s system. He thoroughly questioned the medical examiner on the rate that alcohol metabolizes in the blood system, and, tying this testimony together with that of witnesses who had observed Tom, Sr. drinking "constantly" the night before, he argued to the jury that the victim "had to live long enough after he stopped drinking so that all of the alcohol was cleared from his system. That supports the later time of death at a time when [the defendant] is clearly, clearly not involved."

In addition to the blood and alcohol evidence, other evidence was developed by defense counsel in order to argue for a later time of death. On cross-examination of the medical examiner, counsel brought out the fact that at 8:00 a.m. on April 12 the bodies were in the waning stages of rigor mortis, suggesting a time of death of 8:00 a.m. the previous day. From the fact that the child victim was discovered fully dressed, counsel argued that he was ready to go to school at 8:00 a.m. the day before. Viewing the defense strategy relative to time of death as a whole, we cannot find that the defendant has proven that his counsel performed incompetently in deciding not to employ a toxicology expert.

The defendant's final claim of attorney error involves an allegation that defense counsel failed to attack the search warrant affidavit on the ground that it contained material omissions; namely, the purported exculpatory statements of two witnesses. As discussed above, in addition to the warrant, the consent to search supplied an independent basis for the police to conduct the search of the defendant's premises. Both attorneys testified that they had considered the usefulness of the statements and had rejected them on factual and legal bases as not favorable to the defendant after investigation. *See Wisowaty,* 137 N.H. at 303, 627 A.2d at 575.

We afford a high degree of deference to the strategic decisions of trial counsel, *id.,* "bearing in mind the limitless variety of strategic and tactical decisions that counsel must make." *Chase,* 135 N.H. at 212, 600 A.2d at 933 (quotations omitted). Having found no basis to conclude that defense counsel's performance was less than reasonably competent, we do not consider the issue of prejudice, *see Wisowaty,* 137 N.H. at 302, 627 A.2d at 575, and hold that the

defendant has failed to show that he was deprived of the effective assistance of counsel.

*Affirmed.*

All concurred.