Rockingham
No. 2009-795

THE STATE OF NEW HAMPSHIRE

v.

WALTER HUTCHINSON, JR.

Argued: February 16, 2011
Opinion Issued: April 26, 2011

*Michael A. Delaney*, attorney general (*Susan G. Morrell*, senior assistant attorney general, on the brief and orally), for the State.

*Lisa L. Wolford*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

CONBOY, J. Following a jury trial in Superior Court (*Nadeau*, J.), the defendant, Walter Hutchinson, Jr., was convicted of first-degree murder for the killing of Kimberly Ernest, and sentenced to life in prison without the possibility of parole. *See* RSA 630:1-a (2007 & Supp. 2010). On appeal, he argues that the trial court erred in denying his motion to dismiss for insufficient evidence of causation of death. We affirm.

The facts of this case are well-documented in two prior opinions of this court, and therefore we do not recite them in their entirety. *See State v. Hutchinson*, 156 N.H. 790 (2008) *(Hutchinson II)*; *State v. Hutchinson*, 137 N.H. 591 (1993) *(Hutchinson I)*. By way of brief background, however, we note the following undisputed facts. On October 8, 1991, a jury found the defendant guilty of attempted murder for beating and strangling Ernest, his twenty-one-year-old former girlfriend, causing her to sustain severe brain damage. *See Hutchinson I*, 137 N.H. at 592. Ernest remained in a near comatose state in the Rockingham County Nursing Home for approximately fourteen years until her death on November 6, 2005. In the days leading up to her death, Ernest exhibited signs of illness. On November 3, 2005, she had chest congestion and a fever, and was wheezing and coughing. Nursing home personnel administered Tylenol and Robitussin, as well as nebulizer treatment. Two days later, Ernest's

temperature rose again and she sustained a three to five minute seizure. She was again administered Robitussin and nebulizer treatment, and was additionally treated with an extra dose of her seizure medication, Dilantin, and placed on oxygen by way of nasal catheter. Despite those measures, Ernest's oxygen levels dropped and she sustained a second seizure, which lasted approximately forty-five minutes. She was then transported to the hospital, where x-rays indicated she had developed a respiratory infection. At that point Ernest's family chose to treat her only with comfort measures. She died several hours later.

The State subsequently brought murder charges against the defendant. The defendant sought to bar the charges on double jeopardy grounds and appealed the trial court's denial of his motion to dismiss. We affirmed the trial court's decision on interlocutory appeal. *See Hutchinson II*, 156 N.H. at 791. Thereafter, the defendant was tried and convicted of first-degree murder for Ernest's death.

On appeal, the defendant asserts that the evidence was insufficient to prove that he caused Ernest's death. He does not contest that his actions caused Ernest's permanent brain injury, leaving her in a persistent, near-vegetative state for the fourteen years prior to her death. Nor does he dispute that Ernest's brain injury, and consequent immobility, increased her risk of developing certain illnesses. His sole argument is that the admitted risks to Ernest's health as a result of his actions do not establish the necessary element of legal causation.

In a challenge to the sufficiency of the evidence, the defendant must prove that no rational trier of fact, viewing the evidence in the light most favorable to the State, could have found guilt beyond a reasonable doubt. *State v. Sweeney*, 151 N.H. 666, 673 (2005).

Here, the defendant was convicted of first-degree murder, an element of which is causation of death. *See* RSA 630:1-a, I (a person is guilty of murder in the first degree if he purposely causes the death of another). "To establish causation, the State needed to prove not only that the prohibited result would not have occurred but for the conduct of the defendant, but also that the defendant's conduct was the legal (or proximate) cause of the prohibited result." *State v. Lamprey*, 149 N.H. 364, 366 (2003). In *Lamprey*, we considered the propriety of jury instructions that described a legal cause of death as a cause that is a "direct and substantial factor" bringing about death. *Id.* at 367. We analyzed the instructions in light of our previous holding in *State v. Seymour*, 140 N.H. 736, 746 (1996), that "a legal cause is the cause without which the event would not have occurred, and the predominating cause, a substantial factor from which the event follows as a natural, direct and immediate consequence." *Lamprey*, 149 N.H. at 367. We

concluded that the "direct and substantial factor" language, in combination with an instruction that the prohibited result must be the "direct result" of the defendant's actions, was substantially the same as the "natural, direct and immediate consequence" instruction given in *Seymour*. *Id.* at 367-68. Here, the trial court instructed the jury on causation consistent with *Lamprey* and *Seymour*, and the defendant does not challenge those instructions. Thus, the issue before us is whether there was sufficient evidence that Ernest's death would not have occurred but for the defendant's conduct, and, in keeping with *Lamprey* and *Seymour*, whether there was sufficient evidence that Ernest's death was a natural and direct consequence of the defendant's conduct.

Upon review, we conclude that the evidence in this case was sufficient to support the jury's finding that the defendant's conduct caused Ernest's death beyond a reasonable doubt. At trial, the State introduced the defendant's testimony from his 1991 attempted murder trial. In that trial, the defendant testified that he beat Ernest's head into the floor until she lost consciousness, and that after she regained consciousness and attempted to flee, he caught and strangled her for at least four minutes and continued to strangle her even after she collapsed. Dr. Albert Drukteinis, a forensic psychiatrist who evaluated the defendant, testified that the defendant stated he choked Ernest for five to ten minutes.

Dr. David Heller, the emergency room physician at Exeter Hospital who first treated Ernest after the assault, testified that prior to the assault Ernest had no history of seizures. He further testified that at the time of treatment he believed "the chances of somebody [in Ernest's condition] recovering under these circumstances and having any kind of meaningful life [wa]s very, very unlikely."

Dr. John Robinson, a neurologist who treated Ernest at the Portsmouth Regional Hospital, where she was hospitalized for two weeks following the assault, testified that in the immediate aftermath of the assault Ernest "seized" for approximately three to three and one half hours. He testified that Ernest suffered from hypoxia, a decrease in oxygen due to strangulation, and that the hypoxia caused uncontrolled seizures, which in turn caused additional impairment of her breathing. Robinson further testified that this cycle causes irreversible brain cell death.

Dr. Clinton Miller, a neurosurgeon who also treated Ernest following the assault, testified that Ernest exhibited decerebration, *i.e.*, the stiffening of the limbs, and that this indicated a sign of serious brain injury. He testified that Ernest suffered from "severe, hypoxic brain injury, possibly combined with concussive closed head injury, most likely attributable to acute strangulation," and that uncontrolled seizures were the predictable consequence of hypoxic brain injury. Miller further testified that when the brain

is deprived of oxygen for a period between three to five minutes, irreversible death occurs in the cells of the brain. He went on to testify that persons with severe brain damage, such as Ernest, typically have a shortened life expectancy and that:

> The anticipated eventual cause of death in a patient who has suffered a severe hypoxic or anoxic brain injury of any type . . . is that [she] would succumb to . . . pneumonia, infection, heart attack, urinary tract infection, blood clots forming in the legs because [she is] immobile and then breaking off and traveling up to the lungs so that the ability to get oxygen from the lungs into the bloodstream is impaired.
>
> . . . .
>
> So these patients die from the lack of the ability of the brain to supervise all of our everyday vegetative functions, the things that you and I take for granted.

He further testified that the fact that Ernest lived for fourteen years after the assault was, in his medical opinion, a testament to the extraordinary care provided by the nursing home in which she resided.

Dr. James Whitlock, a neurologist and chief medical officer at the Northeast Rehabilitation Hospital where Ernest was treated after her discharge from the Portsmouth Regional Hospital, also testified that the most significant risks to Ernest's life were pneumonia, infections, seizures, and clots in the lungs due to her immobility. He testified that the majority of people suffering from brain damage similar to Ernest's die within five years of sustaining the initial injury.

Dr. Karl Singer, an attending physician at the Rockingham County Nursing Home, testified that he prepared the death certificate for Ernest. Singer testified that he provided medical attention to Ernest for nearly fourteen years at the nursing home and that concerns for Ernest's health included preventing aspiration and maintaining control of her seizures. Singer testified that while he indicated on the death certificate that Ernest died of natural causes, he "did not think about" Ernest's brain injury when preparing the certificate. He further testified that he had been too limited in his assessment of the cause of Ernest's death when he filled out the death certificate and that the certificate "didn't really reflect the whole nature of [Ernest's] problem over the last 14 years of her life." He stated that when filling out death certificates, doctors "tend to focus on the last few minutes or hours and don't really often put things in context," and that this was "a very common error."

Dr. Jennie Duval, deputy chief medical examiner, testified that she performed an autopsy of Ernest and determined the cause of Ernest's death to be complications resulting from the 1991 brain injury. Duval testified that Ernest "essentially stopped breathing, but it was a complication that directly related to the seizures she was having, and that directly related to the brain injury she suffered on that day in 1991. And that was because of the strangulation. So it all dates back to 14 years previously."

Duval explained that Ernest's medical records indicated that after the assault, Ernest was found unresponsive and seizing. Although emergency workers were initially able to stop the seizures, Ernest continued to have partial seizures every one to two months throughout her fourteen years of long-term care, which required the continuous administration of seizure medication. Duval testified that during those seizures Ernest was at risk for developing aspiration pneumonia, as a result of aspiration of saliva or gastric contents into the lungs. Duval further testified that on the day before Ernest's death she started seizing again, that medical staff were not able to control the seizures, and that x-rays revealed that she had aspiration contents and pneumonia in the lungs.

Duval also testified to two additional health problems that contributed to Ernest's death, both of which she attributed to the severe brain damage Ernest sustained fourteen years prior to her death. Duval explained that Ernest's autopsy revealed that she had a pulmonary embolism, a blood clot, in the main artery that supplies blood to the lungs, which would have decreased the oxygen that reaches the brain. She also had pulmonary edema — excess fluid retention in the lungs. Duval testified that she believed these conditions were caused by Ernest's immobility and that they combined to cause seizures, aspiration of infectious bacteria into her lungs, and, eventually, her death. Duval stated that, to a reasonable degree of medical certainty, the cause of Ernest's death was homicide, death at the hands of another, and that "th[e] final underlying cause that led to her death — even though it was delayed 14 years, that final underlying event was the attempted strangulation 14 years ago at the hands of another person."

The defendant takes the position that this evidence merely supports a conclusion that Ernest's heightened risk of developing illness *could* have caused her death, and, therefore that the evidence is insufficient to establish legal causation. We conclude otherwise. The State presented evidence of the profound damage to Ernest's brain and the resulting associated risks. The State further presented evidence that Ernest died of precisely those conditions for which she was at risk due to her brain injury. Moreover, Duval specifically testified that Ernest died from complications

which were directly related to her strangulation, and thus the cause of Ernest's death was homicide by strangulation.

The defendant points to testimony by Miller that patients with severe hypoxic brain injury tend to "succumb to one of the routine things that cause the death of most of us," and characterizes this testimony as an indication that Ernest's death was just as likely to have occurred without the brain injury. According to the defendant, this testimony suggests that "while it is *possible* that Ernest's death might not have occurred but for strangulation, the evidence just as aptly proved that her death from respiratory illness occurred as it would have in the case of an otherwise healthy, mobile person with respiratory illness." We are not persuaded.

Miller's statement was in answer to a question about the medical complications of immobility, and directly related to his previous testimony about the generally shortened lifespan of persons with severe brain injury. Thus, his statement was an explanation of medical problems that occur in immobile patients, and which cause the death of most people after age has restricted mobility. Under these circumstances, we do not conclude that Dr. Miller suggested that Ernest's death would have occurred without the strangulation which caused her immobility, or that the defendant's assault was not the natural and direct cause of her death.

Nor do we find merit in the defendant's contention that because Ernest lived for fourteen years with her injuries, as opposed to the five years generally projected for patients who are similarly brain injured, she had outlived the risk of death directly caused by the strangulation. As noted above, there was ample evidence to show that Ernest died of the very complications for which persons with severe brain injury and immobility are at risk. Moreover, the defendant points to no evidence that Ernest's heightened risk for those complications was eliminated by her longer lifespan.

Finally, we note the defendant's argument that in *Commonwealth v. Embry*, 272 A.2d 178 (Pa. 1971), expert testimony given to "a reasonable degree of medical certainty" was found insufficient to establish proof beyond a reasonable doubt. *See Embry*, 272 A.2d at 179. The facts in *Embry*, however, are distinguishable. *Embry* concerned a victim with a pre-existing heart condition who died of a heart attack after a purse-snatching. The medical examiner, and sole expert witness in the case, testified that while he was convinced the victim had died of a heart attack, he was not convinced beyond a reasonable doubt that the robbery produced the stress which, in turn, caused the victim's heart attack. *Id.* Thus, the issue in *Embry* was not whether the expert testified based on the proper standard, but, rather, whether the expert's opinion in fact established causation. *Id.*; *cf. Com. v. Alston*, 410 A.2d 849, 851 (Pa. Super. Ct. 1979)

(finding appellant's argument that there was insufficient evidence to prove cause of death beyond a reasonable doubt "entirely specious," where the question presented to the medical examiner was "can you give an opinion with reasonable medical certainty as to the cause of death," and his response was "The cause of death was a stab wound of the thorax").

Our sufficiency of the evidence standard requires that we view each evidentiary item in context and not in isolation. *See State v. Evans*, 150 N.H. 416, 424 (2003). Here, Ernest had no pre-existing medical condition, six expert witnesses testified to Ernest's brain damage, its cause, and the resultant associated risks, including shortened life span due to immobility and infection, and Duval testified that Ernest's death was caused by the defendant's 1991 assault on her. We conclude that this evidence, along with the other evidence adduced by the State, was sufficient to permit a rational jury to conclude, beyond a reasonable doubt, that Ernest's death would not have occurred but for the defendant's conduct and that her death was a natural and direct consequence of the defendant's conduct.

*Affirmed.*

DALIANIS, C.J., and HICKS and LYNN, JJ., concurred.