# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

————————

No. 96-1331

————————

United States of America,    *
                             *
            Appellee,        *
                             * Appeal from the United States
    v.                       * District Court for the
                             * Western District of Missouri
David Wayne Johnson,         *
                             *
            Appellant.       *

————————

Submitted:  November 19, 1996

Filed:   June 11, 1997

————————

Before McMILLIAN, HENLEY and MORRIS SHEPPARD ARNOLD, Circuit
    Judges.

————————

McMILLIAN, Circuit Judge.


    David Wayne Johnson appeals from a final judgment entered in the
United States District Court for the Western District of Missouri,[1] upon
a jury verdict, finding him guilty of armed bank robbery and possession of
a firearm during a crime of violence.  18 U.S.C. §§ 2113(a), (d), 924(c).
For reversal, appellant contends that the

————————————

[1]The Honorable Howard F. Sachs, United States District Judge for the Western
District of Missouri.

district court erred in: (1) denying his motion for judgment of acquittal based on the insufficiency of the evidence, (2) giving an "Allen" charge, and (3) denying his motion for a new trial based on newly discovered evidence. For the reasons discussed below, we affirm the judgment of the district court.

BACKGROUND FACTS

On the morning of August 16, 1994, at or about 9:35 to 9:40 a.m., the North American Savings Bank in Kansas City, Missouri, was held up by a lone individual. Rikki Kreamer, Head Teller, testified that she noticed a man with a bag clutched under his arms walking toward her from the door. At that time, there were no other customers in the bank; therefore, she looked directly at the man as he approached. When he was standing within three feet of her, Kreamer said that the man told her that he was robbing the bank and directed her to give him her money. He then placed the bag on the counter and opened it. She testified that, when the man opened the bag, she saw the butt of a gun inside, and, when he placed his hand into the bag, he appeared to be holding the gun in her direction. She further said that, after she saw the gun, she became frightened and gave the man all of the money in her drawer. Kreamer described the bank robber as a white male wearing a red baseball cap and a loose-fitting, colored shirt that was buttoned down. Although she could not recall anything about his pants, she did notice that they had pockets on the back. She testified that the robber had gray hair, "salt and pepper type," and appeared to be wearing a wig in a darker color than his natural hair; he wore sunglasses with yellow lenses and his mustache was a "salt and pepper" gray. She noticed that he had unusually large feet, was about six feet tall, and weighed around 230 to 250 pounds. She not only identified appellant in court as the man who robbed her, but she had also identified him as the bank robber on September 1, 1994, at a police lineup.

Diane G. Harris, the branch manager, testified that the robber took $3,472.00. Carolyn Newsome, a bank teller who worked next to Kreamer, testified that she

noticed a man hunched over Kreamer, so she moved slightly to get a better look, and realized that a robbery was in progress. Thereafter, she reached under the counter and pushed the button to activate a silent alarm. As soon as the silent alarm was activated, a surveillance camera immediately began to take pictures of the bank interior. At trial, Newsome was unable to identify appellant as the bank robber.

As soon as the alarm was activated, a computer in the Communications Unit of the Kansas City, Missouri, Police Department (KCPD) automatically made a record of the incident. At trial, Jeane Rast, a supervisor in the Communications Unit, explained how the process worked. She testified that the call came in from the North American Savings Bank at exactly 9:40 a.m. on August 16, 1994.

Appellant told the investigating agents that he could not have robbed the bank, because he had been at work at that time at Bob Sight Lincoln Mercury in Kansas City, Missouri. He said he did not recall whether he was supposed to have been at work at 9:00 or 9:30 a.m., but, whatever time it was, he said he was there. During the search of appellant's house, FBI Special Agent Julie Christian found a Day-Minder type of calendar in appellant's living room. She opened it to August 16, and found a notation on the page, "10:00, Bob Sight."

FBI agents interviewed employees at Bob Sight Lincoln Mercury to attempt to verify appellant's alibi. Two of these employees testified at trial about their recollection of the morning of the robbery. Richard E. Barrett, a salesman at the car dealership, testified he believed that on the morning of August 16, he first saw appellant somewhere between 9:40 and 9:50 a.m. However, he also testified he did not look at his watch, and therefore he was not certain of the time.

Larry Frick, the new car sales manager at the car dealership, testified that he had hired appellant as a salesman during the week of August 8, 1994. Appellant was scheduled to arrive at the car dealership between 9:30 and 10:00 on the morning of

August 16th.  Frick testified that he was in a manager's meeting from around 9:00 a.m. until 9:45 a.m., after which he came out onto the sales floor and saw Barrett.  Frick further testified that as he walked out of the meeting, he glanced at a clock, because he was expecting appellant to arrive.  Frick testified the receptionist notified him at 9:56 a.m. that appellant had arrived and that thereafter he spent the greater part of the day, from 10:00 a.m. to 5:00 p.m., training appellant.  He also noted that appellant never returned to work at the car dealership after that day.

That evening, Frick saw a report of the bank robbery on the television news, and the news program showed a surveillance photograph of the robber.  Frick testified that he commented to his wife, "God, that guy looks familiar," but that he did not remember at the time whom the photograph resembled.  After he was contacted by the FBI, he suddenly realized that the photograph looked like the man he had spent the day with on Tuesday, August 16, 1994 — appellant.

FBI Special Agent Eric Gerstein performed a number of "test runs" in an unmarked FBI vehicle in order to determine approximately how long it would have taken a person to get from the bank to the car dealership.  Agent Gerstein started the run  approximately at the same time that the bank robbery had occurred, in order to avoid variations in traffic conditions.  On the last four runs, when he reached the car dealership, he changed his pants and shoes and put on a necktie.  He testified that the average time for the runs was 12 minutes and 18 seconds.

KCPD detectives recovered three items of physical evidence from a delivery man who had found them in a dumpster near the bank --- a red baseball cap with a "Hill's Science Diet" logo, leather gloves, and sunglasses with yellow lenses.  In accordance with standard procedure, the items were taken to the property room of the KCPD.

On August 19, the day after appellant was arrested, he telephoned a friend, Michael D. Hall, of the Kansas City, Missouri, Fire Department, and asked him to contact Agent Christian. Appellant told Mr. Hall about the arrest and asked him to go to the FBI headquarters, look at the surveillance photographs, and tell the agents that they had the wrong man. Hall and appellant were co-workers and friends. Early in the summer of 1994, Hall helped appellant get a job at a local mortgage company, where Hall himself was working at the time. At trial, Hall testified that appellant was supposed to be at work at the mortgage company on Monday, August 15, 1994, but that he did not actually start work until Wednesday, August 17th . On Tuesday, August 16th (the day of the bank robbery), Hall called appellant to find out why he had not come to work that morning. Appellant told Hall that he had been at the car dealership that day and that he would report to work the following morning.

On Monday, August 22, Hall went to FBI headquarters to speak to Agent Christian. Hall believed at the time that by speaking to Agent Christian, he would be able to straighten things out. At trial, Hall identified government's exhibit No. 33 as the photographs he had been shown by Agent Christian. Hall testified that he believed that the person in the bank surveillance photograph was appellant, his friend.

After Agent Christian had shown Hall the photographs on August 22, 1994, she asked him if he had ever known appellant to own or wear a baseball cap. Hall immediately asked her if the cap had a "Hill's Science Diet dog food logo on it." Hall then said that he was color blind, so that he did not know if the cap was red or orange, but that he remembered seeing appellant with a bright-colored cap with a "Hill's Science Diet" logo. Both Agent Christian and Hall testified that it was impossible to read the logo on the cap in the original surveillance photographs viewed at the FBI that day. At the time Hall asked her about the cap, Agent Christian had not yet seen the baseball cap that had been recovered by the KCPD. Immediately after Hall left her office, Agent Christian telephoned Detective Day and asked him if he knew what logo was on the cap. Detective Day had not seen the cap because it had already been taken

to the property room by the time he arrived at the bank. The following day, the KCPD detectives sent Agent Christian some Polaroid photographs of the red baseball cap with a "Hill's Science Diet" dog food logo.

FBI Special Agent Douglas A. Goodin, from the Special Photographic Unit of the FBI Laboratory in Washington, D.C., used image processing computer software to heighten the contrast in the surveillance photographs in order to make it possible to read the logo on the cap worn by the bank robber. Agent Goodin identified the logo as a "Hill's Science Diet" dog food insignia and testified that it was the same type found on the cap found by the KCPD at the bank. Agent Goodin also used a technique known as "photogrammetry" to analyze the surveillance photographs. Agent Goodin explained to the jury that photogrammetry involves using the laws of perspective and the measurement of objects of known size in a photograph in order to make measurements of other objects in the same picture. Using photogrammetric analysis, Agent Goodin determined that the bank robber in the surveillance photographs was approximately 76 inches (6'4") tall and wore a shoe that was approximately 13 inches long. Appellant is 6' 4" tall and wears a size 15 shoe. FBI Special Agent Gary Kanaskie, from the Documents Division of the FBI Laboratory in Washington, D.C., testified that a 13-inch-long shoe would be consistent with a size 15 shoe. Agent Kanaskie further testified, based on two statistical papers published by the Footwear Industries of America, that only 0.3% of the men's athletic shoes sold in retail stores in the United States in 1993 were size 15.

Dr. Gary L. Baker, a plastic surgeon, testified as an expert witness for the defense. He testified that he believed that the ear of the bank robber, as he saw it in the surveillance photographs, was different from that of appellant. Dr. Baker testified in a deposition on November 1, 1995, that he had examined a series of surveillance photographs taken during the robberies of the Interstate Bank (hereinafter Interstate) in May of 1995 and in September of 1995. Appellant was incarcerated in May and September 1995. Dr. Baker said that he had compared the surveillance photographs

of the Interstate Bank robber to the surveillance photographs of the North American Savings Bank robbery in August 1994. Dr. Baker testified that the ear of the May 1995 Interstate robber was "very similar" to that of the man in the North American Savings Bank surveillance photographs.

FBI Special Agent William J. Stokes from the FBI Special Photographic Unit in Washington, D.C., testified as an expert rebuttal witness for the government. Agent Stokes testified that, because of the poor quality of the surveillance photographs, it would have been impossible for Dr. Baker to see the details necessary to make an accurate ear identification.

Barbara Garrett, an employee of Interstate since 1990, stated in her November 1, 1995, deposition that she was present during both robberies. Garrett said that she believed that the same man committed both of the 1995 robberies, as well as the robbery she had witnessed at Interstate in 1991. She described the robber as a white male in his 50s to 60s, about 6' to 6'2" tall, with "a large nose, scarred or weathered face, gray bushy moustache," and wearing a baseball cap. Garrett testified that, in both the May and September robberies, the bank robber took the keys to an employee's car and used the car to flee the scene, abandoning it nearby. She examined the surveillance photographs taken during the robbery of the North American Savings Bank on August 16, 1994. Thereafter, she testified that the man in one of the surveillance photographs of the North American Savings Bank robbery did look similar to the man who robbed Interstate in May and September 1995, but that in another of the surveillance photographs, the North American Savings Bank robber did not look similar to the Interstate robber.

Jennifer Tate, another Interstate employee, was present during the May and September 1995 robberies. She stated in her deposition that the same man committed both of the 1995 robberies. Tate described the Interstate robber as about 5'6" tall, with a slender build, a black and gray bushy moustache, and wearing a baseball cap and

sunglasses.  Tate also examined defense exhibits Nos. 1-6, the surveillance photographs taken of the North American Savings Bank robbery.  She stated that she did not believe that the man in defense exhibits Nos. 1-6 was the same man who had robbed her at Interstate.

Michelle Hill stated in her deposition that she had been an employee at the Interstate Bank for approximately a year and a half and that she was only present for the May 1995 robbery.  Hill said that she had a good opportunity to see the man who robbed Interstate in May 1995, because he had approached her teller window to commit the robbery.  She examined defense exhibits Nos. 1-6, the surveillance photographs taken of the North American Savings Bank robber, and stated that she did not believe that the man in those photographs was the same man who had robbed her at Interstate in May of 1995.

Finally, Jackie Duckett said in her deposition that she had been an employee at Interstate for 16 years.  Duckett testified that she was present during two robberies at Interstate in 1991, as well as the robberies in May and September of 1995.  She said that she believed that all four robberies had been committed by the same person, a man "at least 6 feet tall, 170 pounds, slightly built," with "salt and pepper" hair and a bushy moustache.  Duckett examined photographs of the 1994 North American Savings Bank robber and testified that the only similarities that she noticed between that robber and the Interstate robber were the cap and the sunglasses.

The jury found appellant guilty of armed bank robbery and possession of a firearm during a crime of violence.  The district court sentenced appellant to a total of 105 months imprisonment, 3 years supervised release, restitution in the amount of $3,475.00, and special assessments of $100.00.  This appeal followed.

SUFFICIENCY OF THE EVIDENCE

Appellant first argues that the evidence presented at trial was insufficient as a matter of law to support the jury's verdict.  To decide whether the evidence is sufficient to support a verdict, the court views the evidence in a light most favorable to the verdict and accepts all reasonable inferences favorable to the government that logically can be drawn from the evidence.  United States v. Grey Bear, 828 F.2d 1286, 1291 (8th Cir. 1987) (subsequent history omitted), citing United States v. Gleason, 766 F.2d 1239, 1246 (8th Cir. 1985), cert. denied, 474 U.S. 1058 (1986).  The evidence need not exclude every reasonable hypothesis of innocence.  United States v. Holmes, 13 F.3d 1217, 1220 (8th Cir. 1994) (quoting United States v. Temple, 890 F.2d 1043, 1045 (8th Cir. 1989)).  Rather, we will reverse a verdict only when a reasonable factfinder could not have found the defendant guilty beyond a reasonable doubt.  While it is true that appellant presented ample evidence from which a jury could have found him not guilty, the law is well established that it is the jury's function to evaluate the credibility of witnesses.  United States v. Jackson, 959 F.2d 81, 82 (8th Cir.), cert. denied, 506 U.S. 852 (1992).  Here, the jury heard appellant's alibi and all of his alibi witnesses; they also heard that no evidence of the robbery was found in his home and the strong testimony of his expert witness, Dr. Baker.  Given the jury's opportunity to view the witnesses and evaluate the witnesses' possible motives or biases, the jury was uniquely situated to determine whose testimony was credible.  Here, the jury chose not to believe appellant's witnesses.  Therefore, we will not usurp the function of the jury to determine credibility, absent a finding that no reasonable person could have reached a conclusion the defendant was guilty beyond a reasonable doubt.

Here, our review of the evidence presented by the government reveals ample support for the jury's finding that appellant was indeed the man who robbed the North American Savings Bank in Kansas City, Missouri, on August 16, 1994.  The government presented eyewitness testimony from Rikki Kreamer, the bank teller who

was robbed. Not only did she identify appellant in court without hesitation, but she also selected appellant from a live police line-up shortly after the robbery.

Moreover, appellant's friend and co-worker, Michael Hall, testified that he had seen appellant with a "Hill's Science Diet" baseball cap prior to the bank robbery in question. The bank robber in the surveillance photographs also wore a "Hill's Science Diet" baseball cap. This cap was later recovered in the dumpster at the rear of the bank and the bank employees identified it as the cap worn by the robber. Hall also testified that he believed that appellant is the individual shown in the surveillance photographs.

The government also presented testimony from other witnesses who identified appellant as the robber in the photographs. Larry Frick, appellant's supervisor during his one day of employment at the car dealership, testified that he spent an entire day with appellant on the day of the robbery, beginning at approximately 9:56 a.m. Frick identified appellant as the person in the bank surveillance photographs. He also testified that he also recognized appellant from a television news program in which a surveillance photograph of the bank robber was shown to viewers.

Debra A. Dutro, appellant's ex-wife, also testified that the person in one of the bank surveillance photographs bore strong resemblance to appellant. She also testified that appellant had told her that it was "tantalizing to pull a sting or make a heist" and that she believed that appellant was having financial difficulties during the period before the robberies.

The government also offered into evidence the actual surveillance photographs, placed next to a posed photograph of appellant wearing a baseball cap and sunglasses similar to those worn by the bank robber. Appellant in the posed photograph stood at the same teller window where the robbery occurred. Comparison of the posed photograph with the surveillance photographs reveals an incredible likeness. Clearly, a reasonable jury could have reached the conclusion that appellant committed the bank

robbery at North American Savings Bank after comparing the posed photograph and the surveillance photographs taken at the time of the robbery.

Finally, the government introduced testimony from expert witnesses from the FBI. Agent Goodin, an FBI forensic photogrammetry expert, testified that in his opinion the person depicted in the bank surveillance photographs was approximately 6'4" tall and wore shoes of approximately 13 inches in length. Agent Kanaskie, another FBI forensic expert, testified a 13 inch shoe was consistent with a size 15 shoe and that only 0.3% of the men's athletic shoes sold in the United States retail stores were size 15. Appellant is 6'4" tall and wears a size 15 shoe.

In the present case, more than sufficient evidence was presented by the government, and, given our standard of review, we reject appellant's contention that there was insufficient evidence to support the jury verdict.

ALLEN CHARGE

Next, we take up appellant's argument that the supplemental Allen charge[2] jury instruction given by the district court was coercive and thus constituted reversible error. The district court gave the Allen charge after the jury had deliberated for about 3 ½ hours and the jury foreperson had sent a note to the district court stating that the jury was deadlocked and evenly divided. (We note that "[i]t is improper for a trial court to ask a deadlocked jury about its numerical division, a proper [Allen] instruction may nevertheless be given if the jury's numerical division is given, without solicitation, by the jury [foreperson]." United States v. Cook, 663 F.2d 808, 809 n.3 (8th Cir. 1981) (per curiam).)

_____

[2]Allen v. United States, 164 U.S. 492, 501 (1896) (approving supplemental instructions advising deadlocked jurors to consider each other's views).

First, we note appellant never objected to the giving of the charge or to its wording and indeed actively supported the district court's decision to give the charge rather than declaring a mistrial.[3] Fed. R. Crim. P. 30 states that no party may assign as error any portion of the charge or omission therefrom unless they object thereto before the jury retires to consider its verdict, stating distinctly the matter to which they object and the grounds of their objection. <u>Id.</u> at 810, <u>citing</u> <u>Hankerson v. North Carolina</u>, 432 U.S. 233, 244 n.8 (1977) ("[T]he normal and valid rule [is] that failure to object to a jury instruction is a waiver of any claim of error."). When a defendant raises an objection to a jury instruction for the first time on appeal, the challenge comes too late to be preserved, unless the instruction constituted "plain error" under Fed. R. Crim. P. 52(b). <u>United States v. Holy Bear</u>, 624 F.2d 853, 855 (8th Cir. 1980). Although appellant himself does not even assert "plain error" under Fed. R. Crim. P. 52(b), his claim would only be cognizable were he able to meet the stringent requirements of that rule by showing that giving the <u>Allen</u> charge amounted to a miscarriage of justice. <u>United States Cook</u>, 663 F.2d at 810 (plain error rule should be applied with caution), <u>citing</u> <u>United States v. Robinson</u>, 419 F.2d 1109, 1111-12 (8th Cir. 1969) (<u>Allen</u> charge held not plain error). Our examination of the record reveals,

---

[3]After the government attorney, in response to the district court's request for suggestions, requested that the district judge give an <u>Allen</u> charge, defense counsel offered the following:

> Frankly, I don't know what to think. I don't necessarily object to that. I would rather have a decision than retry the case next month. I don't know even if it is possible for me to retry it next month.
>
> It is 6 to 6. Frankly, if we tell them to keep trying, whose favor does that work in? Well, nobody knows the answer to that. . . . I would like to see them reach a decision, so I guess I am supporting [the government]. I would leave it up to the court.

far from having committed clear error, the district court acted well within its sound discretion in giving the Allen charge.

Before giving the Allen charge, the district court consulted with counsel for both sides, indicating that, although it was earlier than he had declared mistrials in the past, the note was also particularly convincing.  The government attorney suggested that, in light of the length of the trial, over a week, and the short period of deliberation thus far, it might be advisable to deliver an Allen charge rather than declare a mistrial.  Defense counsel, obviously believing that the charge would not be prejudicial to his client in the circumstances, also urged the district court to give an Allen charge.  In United States v. Hiland, 909 F.2d 1114, 1137-38 (8th Cir. 1990), quoting Amos v. United States, 496 F.2d 1269, 1273 (8th Cir.), cert. denied, 419 U.S. 896 (1974), this court held that the defense lawyer's failure to object to the Allen charge permits an inference that the procedure utilized did not seem coercive at the time.  The fact that the jury was evenly divided notably eliminated one of the chief concerns regarding potential coerciveness of the Allen charge: the fear that jurors in the minority might feel pressure to concede their conscientious position in order to achieve a unanimous verdict.  See Potter v. United States, 691 F.2d 1275, 1278 (8th Cir. 1982); United States v. Cook, 663 F.2d at 810.

Our court has consistently rejected the argument that the Allen charge is inherently coercive and has established a four-element test for determining whether a particular Allen charge was impermissibly coercive: (1) the content of the instruction, (2) the length of deliberation after the Allen charge, (3) the total length of the deliberations, and (4) any indicia in the record of coercion or pressure upon the jury.  United States v. Thomas, 946 F.2d 73, 76 (8th Cir. 1991) (citing United States v. Cortez, 935 F.2d 135, 141-42 (8th Cir. 1991), cert. denied, 502 U.S. 1062 (1992)).  Under this test the Allen charge delivered by the district court did not have an impermissibly coercive effect on the jury's verdict.

-13-

First, we look at the contents of the charge. Here, the district court used supplemental instruction 10.02, taken from the 8th Circuit Manual on Model Jury Instructions (Criminal), and explicitly approved by this court in United States v. Thomas, 946 F.2d at 76. Defense counsel did not object to the content of the charge. The district court read the entire model instruction, without omitting any of the five essential elements of the Allen charge enumerated by this court in United States v. Smith, 635 F.2d 716, 721 (8th Cir. 1980). Secondly, the jury deliberated for approximately 3 more hours after the Allen charge was given before returning a verdict. This court has previously found that much shorter periods of post-Allen charge deliberation did not indicate a coercive effect. Id. at 721-22 (45 minutes did not indicate a coercive effect); see United States v. Hiland, 909 F.2d at 1137 (court declined to draw inference of coercion from 10-minute post-Allen deliberation period, where there was no evidence of coercion and defense counsel did not object to the charge at the time).

Next, we look at the total length of the deliberations. The jury deliberated a total of approximately 6 ½ hours after a 5 ½-day trial, a period of time that was clearly not so disproportionate as to raise an inference that the Allen charge coerced the jury. United States v. Smith, 635 F.2d at 721; United States v. Cook, 663 F.2d at 811 (6-7 hours of total deliberation not disproportionate to a 2-day trial); cf. Williams v. Fermenta Animal Health Co., 984 F.2d 261, 266 (8th Cir. 1993) (over 6 hours of total deliberation not disproportionate to 2 ½-day civil trial).

Finally, the record in the present case contains no other indicia of coercion. In fact, the record reveals that the district court did everything possible in the circumstances to minimize the possibility of coercion. For example, the district court did not want to keep the jury deliberating when they were tired or frustrated or force them to return the next day if they would prefer to continue and allowed the jury to control its own schedule. After reading the Allen charge around 4:00 p.m., the district court asked the jury to vote on whether they would like to recess for the day and return

-14-

the next morning, rested, to continue deliberation.  The jury voted to stay and deliberate further.  When the jury sent out another note an hour later indicating a switch in only one vote, defense counsel did not move for a mistrial.  Nor does the fact that the jury subsequently returned a verdict of guilty indicate coercion.  Consequently, we hold the district court did not err in giving the <u>Allen</u> charge.

MOTION FOR A NEW TRIAL

Finally, we consider appellant's argument that the district court erred in denying his motion for a new trial based on newly discovered evidence.  We review the district court's decision for clear abuse of discretion.  <u>United States v. Johnson</u>, 12 F.3d 827, 833-34 (8th Cir.) (citing <u>United States v. Provost</u>, 921 F.2d 163, 165 (8th Cir. 1990) (per curiam), <u>cert. denied</u>, 499 U.S. 968 (1991)), <u>cert. denied</u>, 511 U.S. 1095 (1994).  In order to secure a new trial based on newly discovered evidence, the defendant must demonstrate (1) the existence of new evidence, (2) due diligence, (3) the relevance of the evidence to a material issue, (4) the probability that evidence would lead to an acquittal on retrial, and (5) the evidence is not merely cumulative or impeaching.  <u>Id.</u>  In five motions for a new trial based on newly discovered evidence, appellant alleged new evidence on three separate topics, only one of which is argued in this appeal.[4]

---

[4]In his first motion for a new trial based on newly discovered evidence, filed on May 10, 1995, appellant alleged that there was a discrepancy between government witness Rikki Kreamer's testimony at trial and her victim impact statement, which was given after the trial.  In his memorandum accompanying the order denying appellant's motion, the district judge deemed the evidence merely impeaching and unlikely to lead to acquittal on retrial.  Appellant refers to this finding in his brief but presents no argument, facts or authority to contest it.  Therefore, we hold that this point has been waived.  In his final motion for a new trial filed on December 1, 1995, appellant presented evidence regarding a visible cold sore that he said he had several days before the bank robbery.  In his memorandum and order denying the motion, the district judge ruled that this evidence had not been diligently produced by appellant.  Appellant does not argue this alleged new evidence on appeal.

The newly discovered evidence that appellant argues in his brief before this court was first presented in his second motion for a new trial based on newly discovered evidence, filed on May 19, 1995.[5] In this and subsequent motions, filed on July 3, 1995, October 10, 1995, and December 1, 1995, appellant presented evidence regarding the two Interstate robberies on May 10, 1995, and September 14, 1995. Both Interstate robberies occurred while appellant was incarcerated pending sentencing. Appellant argues that the Interstate robber was not only similar in appearance but also similar in his modus operandi to the man who robbed North American Savings Bank on August 16, 1994, and that evidence of this similarity cast enough doubt upon his conviction for the North American Savings Bank robbery to warrant granting a new trial. The government cooperated with appellant in obtaining evidence regarding the Interstate robberies. Specifically, the government acceded to appellant's unusual request to take depositions of the witnesses to the Interstate robberies, to serve in lieu of testimony at a hearing. On November 21, 1995, at the courthouse and in the presence of appellant, depositions were taken from Dr. Baker, the plastic surgeon who testified as an expert defense witness at trial, and from four Interstate employees who witnessed one or both of the 1995 robberies.

In the order denying the final motion for a new trial based on newly discovered evidence, the district court ruled that the evidence produced by appellant satisfied the first 3 elements of the test: (1) it was in fact new evidence, (2) it was diligently produced, and (3) it was relevant to a material issue, that is, the identity of the North American bank robber. However, the district court decided the evidence did not satisfy

---

[5]Appellant in his brief states that the new evidence presented in this appeal was first presented to the district court in his motion filed on May 10, 1995. See Brief for Appellant at 28 n.33. However, this evidence regarding a bank robbery that occurred on May 10, 1995, was first presented in the second motion for new trial filed on May 19, 1995.

the last 2 elements of the test because it was merely cumulative or impeaching and was not likely to lead to an acquittal on retrial.

Each of the four Interstate witnesses who testified at the November 21, 1995, deposition hearing acknowledged there were some superficial similarities in appearance, each also stated that she did not believe that the Interstate robber was the same man who robbed North American Savings Bank. In addition, there was at least one striking difference between the modus operandi of the Interstate robber and that of the North America Savings Bank robber; i.e., the Interstate robber took the car keys of a bank employee and made his escape in the employee's automobile; the North American Savings Bank robber did not make his getaway in this distinctive manner.

The only deposition testimony that supported appellant's position was that of the defense expert witness, Dr. Baker. Dr. Baker examined the photographs of the Interstate robber and testified that the ears of the Interstate robber and the North American Savings Bank robber, as he appeared in the surveillance photographs, were "very, very similar." The district court found there were semantic difficulties and inexact language usage in Dr. Baker's testimony and concluded that there was ambiguity in his testimony and that he had serious doubts as to Dr. Baker's expertise. The district court was also concerned that appellant had not refuted the stronger points in the government's case, such as the testimony of appellant's friend, Captain Michael Hall, that he had seen appellant with a red or orange "Hill's Science Diet" baseball cap just like the one discovered near the bank and worn by the robber in the surveillance photographs.

After reviewing the district court's thorough and carefully considered memorandum accompanying its order denying the final motion for a new trial, we hold that the district judge did not abuse his discretion in deciding that the alleged newly discovered evidence presented by appellant did not satisfy what this court has termed

"our rigorous criteria for the grant of this disfavored motion." <u>United States v. Doyle</u>, 60 F.3d 396, 398 (8th Cir.) (per curiam), <u>cert. denied</u>, 116 S. Ct. 538 (1995).

We hold that there was sufficient evidence to support the jury's verdict, the <u>Allen</u> charge was not coercive, and the newly discovered evidence was merely cumulative or impeaching and was not likely to lead to an acquittal on retrial. Accordingly, we affirm the judgment of the district court.

A true copy.

    Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-18-