Sullivan
No. 96-339

# THE STATE OF NEW HAMPSHIRE

## v.

# STEVEN ALEXANDER

December 23, 1998

*Philip T. McLaughlin*, attorney general (*Malinda R. Lawrence*, attorney, on the brief and orally), for the State.

*Gary Apfel*, assistant appellate defender, of Orford, by brief and orally, for the defendant.

BRODERICK, J. After a jury trial in Superior Court (*Morrill*, J.), the defendant, Steven Alexander, was convicted of arson, *see* RSA 634:1, II(a) (1996), for setting fire to the apartment building in which he resided. On appeal, the defendant argues that the trial court erred: (1) in limiting his cross-examination of two prosecution witnesses; (2) in denying his motion to dismiss based on insufficient evidence; and (3) in fashioning certain instructions to the jury when it appeared to be deadlocked. We affirm.

At trial, the State presented the following evidence. In July 1993, the defendant rented a second floor apartment in the Eagle Block in Newport. On July 24, 1993, the day before the fire, the defendant and Debra Porter, a second floor neighbor, had an argument about Porter playing her stereo loudly. The defendant responded by playing his radio loudly as well, and the two exchanged profanities. When the police arrived, Porter turned her music down as instructed, and the two had no further contact that day.

On July 25, 1993, the day of the fire, Porter left her apartment at 2:20 p.m. and locked both apartment doors, which were then undamaged. Around three o'clock, the defendant stopped at a convenience store, an approximate ten to fifteen minute drive from the Eagle Block. The store's cashier testified that she received a phone call from an unidentified man who requested the store owner's phone number. A few minutes later she received a call from the owner telling her that Steven Alexander, who was unknown to the owner, would be coming to the store to charge a few items on store credit. The cashier testified that the defendant was acting "a little strange." He insisted that he knew the cashier, telling her not to deny that she knew him. He also asserted that he knew or was related to the owner, and that the owner had given him permission

to charge wine. The cashier called the owner, who instructed her not to charge the wine. Following this, the defendant charged cigarettes and $3.00 worth of gasoline. At the owner's instruction, the cashier recorded the defendant's telephone and license plate numbers.

Between four and five o'clock, another tenant, Betty Andrews, who lived down the hall from the defendant, returned to her apartment with her boyfriend, Michael Tassinari. Within fifteen to thirty minutes, Andrews smelled gasoline. Unable to determine its source, she and Tassinari stepped into the hallway where they detected a very strong gasoline odor, but saw no smoke. While in the hallway, Andrews noticed the defendant leave and lock his apartment while holding something in his arms. When Andrews asked if he could smell gasoline, the defendant responded "no," acting "kind of shaky" or "nervous" as he walked toward the back door. Andrews returned to her apartment and promptly called the police to report the odor. During the call, the building's smoke alarms activated. Police dispatch received this call at 5:23 p.m. Andrews returned to the hallway, saw smoke coming from the direction of Porter's apartment, and made a second call to the police to report the fire.

At approximately 4:30 p.m., Neal Goldberg, a tenant who lived across the hall from the defendant, heard "constant banging" near Porter's apartment, which continued for several minutes. Goldberg assumed that someone was working on a door. At about five o'clock, several individuals in a meeting room located directly below Porter's apartment heard a crash, along with banging and scuffling noises coming from Porter's apartment. Shortly thereafter, they saw the defendant make two or three rapid trips up and down the outside staircase, removing various items from the building, including clothes and soda. After the defendant's third trip at approximately 5:20 p.m., a member of the group detected smoke, went outside, and witnessed the building engulfed in flames.

Hearing the smoke alarms, Goldberg fled his apartment and saw the defendant descending the staircase. While departing, Goldberg noticed a large hole in Porter's apartment door. It appeared to him that the apartment had been broken into.

At the scene, the police arrested the defendant for interfering with rescue efforts by encouraging a woman trapped on the roof to jump. The police released the defendant from custody but arrested him a second time, subduing him with pepper spray, when he continued to interfere with rescue efforts and disobey law enforcement. The police transported the defendant to the police station where he admitted to purchasing cigarettes and gasoline for his car that afternoon at a local convenience store. He claimed, however,

that the Eagle Block was in flames when he returned. He denied being in or removing items from the building just prior to or at the time of the fire.

Through its investigation, the State Fire Marshal's office determined that the Eagle Block blaze was the result of arson, which began in Porter's apartment with gasoline used as an accelerant.

I

■ The defendant first argues that the trial court's refusal to permit him to cross-examine Michael Tassinari and Betty Andrews regarding motive and bias violated his right of confrontation under the State and Federal Constitutions and constituted an abuse of discretion under New Hampshire Rule of Evidence 403.

At trial, the defendant offered to prove that approximately one month before the fire, Andrews accused Tassinari of domestic violence, criminal mischief, and criminal trespass, and that one criminal charge was pending against Tassinari on the day of the fire. The defendant asserted that this evidence suggested that Tassinari harbored a grudge against Andrews, and set the fire to punish her. Based on this theory, the defendant sought to cross-examine both Tassinari and Andrews to establish Tassinari's involvement in the fire, their conflicting accounts of events on the day of the fire, and Tassinari's repeated efforts to direct police attention to the defendant. The trial court prohibited this cross-examination under Rule 403.

The defendant argues that the trial court's ruling violated his right of confrontation under the State and Federal Constitutions. He also asserts that while an evidentiary rule can limit cross-examination, it may not bar proposed interrogation of an adverse witness to establish motive and bias. *See State v. Allison*, 134 N.H. 550, 558, 595 A.2d 1089, 1094 (1991).

We first examine whether the defendant's constitutional objections were preserved. "[W]e will not review on appeal constitutional issues not presented below." *Snow v. American Morgan Horse Assoc.*, 141 N.H. 467, 472, 686 A.2d 1168, 1172 (1996) (quotation omitted). The defendant argues that the constitutional challenge was preserved at trial by his assertion that "bias is always relevant in impeachment." In context, however, the defendant's evidentiary argument was clearly directed to Rule 403 and not to the constitutional right of confrontation:

> Given that motive is one of the things that is considered in
> an arson case, I think it is probative and not — and not

substantially outweighed by the prejudice that in terms of relevance . . . . And bias is always relevant in impeachment. This is MCCORMICK ON EVIDENCE, your Honor, Fourth Edition, under Impeachment, Section 39 under Partiality, recognize[s] that if anyone has any type of interest, it can be explored. That this is not — this is under the common law rules of evidence. It does not fall within the purview of a specific rule of evidence. That self-interest of the witness is always an issue.

The defendant's impeachment argument was specifically raised in terms of evidence generally admissible under the rules of evidence. *See* N.H. R. EV. 403. Though the MCCORMICK ON EVIDENCE section counsel cited mentions the constitutional aspect of impeachment evidence, *see* 1 J. STRONG, MCCORMICK ON EVIDENCE § 39, at 131 (4th ed. 1992), counsel relied on that section for the proposition that no specific evidentiary rule is necessary to establish that witness motive and bias are permissible impeachment issues. We recognize that impeachment of a witness and a criminal defendant's right to confront adverse witnesses are somewhat intertwined. *See State v. Kiewert*, 135 N.H. 338, 347, 605 A.2d 1031, 1037 (1992) (holding that hearsay objection did not preserve for appellate review constitutional issue of right to confront and cross-examine adverse witness). However, "despite the superficial similarity between the evidentiary rule and the constitutional clause, we are not eager to equate them." *Id.* at 348, 605 A.2d at 1037 (brackets, ellipses, and quotation omitted); *cf. State v. Goding*, 128 N.H. 267, 270, 513 A.2d 325, 328 (1986) (due process issue preserved where defendant challenged, in conjunction with double jeopardy challenge, propriety and fairness of charge of driving while intoxicated, second offense).

The defendant is not entitled to have the trial judge consider alternate grounds for admitting evidence that defense counsel has not articulated. *See State v. Winn*, 141 N.H. 812, 813, 694 A.2d 537, 538 (1997); *see also State v. Mills*, 136 N.H. 46, 49, 611 A.2d 1104, 1105 (1992) (single, specific objection concerning competency of child witness rendered other related arguments unpreserved). Because the defendant did not specifically assert a constitutional objection to the trial court's exclusion of the domestic violence evidence, the constitutional argument was waived and not preserved for appellate review. *See State v. Nutter*, 135 N.H. 162, 164, 600 A.2d 139, 140 (1991) ("errors discovered by combing record after trial and never properly presented to the trial judge should not be utilized to set aside a verdict" (brackets and quotation omitted)).

The defendant next argues that the trial court misapplied Rule 403 to bar cross-examination of Andrews and Tassinari on issues of motive and bias. We review the trial court's decision to exclude evidence for abuse of discretion. *See State v. Zeta Chi Fraternity*, 142 N.H. 16, 26, 696 A.2d 530, 538, *cert. denied*, 118 S. Ct. 558 (1997). "To prevail on an abuse of discretion claim, the defendant must show that the trial court's decision was clearly untenable or unreasonable to the prejudice of his case." *Id.* (quotation omitted). Under Rule 403, the trial court may exclude otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.H. R. EV. 403.

The defendant asserts that the jury, and not the judge, should decide whether the anticipated evidence of motive and bias was too remote under Rule 403. To the contrary, the trial court determines preliminary questions concerning the admissibility of evidence, including whether evidence is stale or too remote. *See* N.H. R. EV. 104(a); *cf. State v. Kelly*, 125 N.H. 484, 488, 484 A.2d 1066, 1069 (1984) (trial court, in its discretion, determines whether evidence is too remote) (decided prior to New Hampshire Rules of Evidence).

The defendant further argues that the court's finding of remoteness ignores the fact that Tassinari was subject to a pending criminal charge on the day of the fire. The court, however, recognized that Andrews and Tassinari had a "very off and on" relationship, and that their relationship was "on" at the time of the fire — a fact not challenged by the defendant with any evidence. Moreover, the fire was not started in Andrews' apartment, but was started in Porter's apartment, and the defendant offered no evidence suggesting Tassinari had any connection to Porter or her apartment. As the defendant conceded at trial, there was absolutely no evidence connecting Tassinari to the fire. The trial court apparently found no credible nexus between Andrews' and Tassinari's relationship and the fire. We cannot say the trial court abused its discretion in reaching this conclusion.

The defendant also asserts that the State failed to show that the evidence would have caused unfair prejudice to its case, which he argues is required under Rule 403. Unfair prejudice, however, is only one of several independent factors that weigh against admitting otherwise probative evidence. *See* N.H. R. EV. 403. With respect to the unfair prejudice factor, the prosecutor argued at trial

that evidence of the domestic violence petition and criminal mischief and trespass charges invited the jury to discount Tassinari's testimony based on his alleged bad character — an improper basis. *See State v. Carter*, 140 N.H. 1, 5, 662 A.2d 289, 291 (1995). In addition to finding unfair prejudice, *see Simpkins v. Snow*, 139 N.H. 735, 741, 661 A.2d 772, 777 (1995), the trial court apparently reasoned that the proffered evidence of motive and bias would tend to confuse and mislead the jury, and cause undue delay and waste time, especially given its remoteness and speculative nature. We find the trial court's decision to exclude it well within its discretion.

## II

■ The defendant next argues that there was insufficient circumstantial evidence to convict him of arson. To succeed on a sufficiency claim, the defendant must show "that no rational trier of fact could have found guilt beyond a reasonable doubt, viewing the evidence in the light most favorable to the State." *State v. Silva*, 142 N.H. 269, 273, 699 A.2d 591, 594 (1997) (quotation omitted). Where the State presents only circumstantial evidence to prove guilt, such evidence must exclude all rational conclusions other than guilt to be sufficient to convict. *State v. Newcomb*, 140 N.H. 72, 80, 663 A.2d 613, 619 (1995). We "consider the evidence in the light most favorable to the State, and we examine each evidentiary item in the context of all the evidence, not in isolation." *State v. Duguay*, 142 N.H. 221, 225, 698 A.2d 5, 8 (1997) (quotations omitted).

The defendant focuses on the lack of physical evidence, the assertion that others had a superior motive to set the fire, and the argument that a defendant's presence at a crime scene alone is insufficient to convict.

The defendant does not cite any legal support for the proposition that lack of physical evidence tying him to the fire, standing alone, bars his conviction. In fact, case law suggests otherwise. *See, e.g., State v. Hopps*, 123 N.H. 541, 543-45, 465 A.2d 1206, 1208-09 (1983) (circumstantial evidence sufficient to sustain arson conviction even though no physical evidence directly connected defendant to arson scene).

We are unpersuaded by the defendant's next assertion, again offered without legal support, that there was insufficient evidence to convict because others had superior motive to set the fire. Assuming, without deciding, that others had a superior motive, there was no evidence establishing a credible nexus between those with greater motive and the fire.

Furthermore, we conclude that a rational jury could have reasonably decided that all rational inferences other than guilt had been excluded beyond a reasonable doubt. Several independent witnesses testified to seeing the defendant hurriedly remove personal belongings from the building within one-half hour of the fire. Also, the defendant denied detecting the prevalent smell of gasoline and acted "nervous" and "shaky" near the fire's point of origin just moments before it started. Further, witnesses saw the defendant descending the staircase just moments after the smoke alarms sounded though he denied being in the building at that time. The State established the defendant's motive to start a fire to get even with Porter, and the evidence conclusively established that the fire began in her apartment.

Moreover, while "mere presence" at a crime is insufficient to convict, see State v. Goodwin, 118 N.H. 862, 866, 395 A.2d 1234, 1236 (1978), a rational jury could conclude that the defendant lied to the police about his presence in the building at the time of the fire. See Duguay, 142 N.H. at 226, 698 A.2d at 8 (jury can infer a culpable mental state from defendant's efforts to deceive police). Similarly, a rational jury could conclude that the defendant was attempting to establish an alibi on the afternoon of the fire when he went to the convenience store, acting as if he knew the cashier and store owner, and later told the police that the building was in flames when he returned.

Accordingly, we find that the trial court did not err in denying the defendant's motion to dismiss for lack of sufficient evidence.

III

The defendant's final argument is that the trial court's instruction to the jury during deliberations erroneously interfered with the deliberative process, and that the trial court erred in refusing to give the standard deadlock instruction.

After approximately five and three-quarter hours of deliberation over a two-day period, the jury sent a note to the trial judge stating, "[W]e appear to be deadlocked." Defense counsel asked the court to give the model deadlock instruction, patterned after State v. Jordan, 130 N.H. 48, 534 A.2d 378 (1987). The court denied this request, reasoning that it was premature. Over defense counsel's objection, however, the trial judge entered the jury deliberation room with counsel and instructed the jury:

> I don't want you to say anything to me or to indicate where you stand or how your deliberations are going or anything else. I've talked with counsel, and here's what I propose you do. And this has had some success in the past for me. I would like those of you who are on one side to one by one to carefully and completely and clearly articulate the opposing point of view. Why the people or persons who are opposed to you, opposed to your viewpoint, I want you to express their argument as if you were them. So that and for those of you who are on the other side, I want you to do the same exercise. All right. And I want all — I'd like all twelve of you to do it. You can do it any way you want, but I think it's worthwhile if all twelve of you clearly articulate the other side's point of view and all the points that they'd made as if you were arguing it for them.
>
> When you're done with that exercise, what I'd like you to do is decide whether it be worthwhile to continue your deliberations today knowing that you're going to knock off at 4 o'clock, or whether you'd prefer to suspend and come back tomorrow morning at 9. Okay. All right. Good luck.

We acknowledge that the trial judge enjoys broad discretion in determining when and whether to instruct a jury on a deadlock charge. *See State v. Hartford*, 132 N.H. 580, 583-86, 567 A.2d 577, 580-81 (1989) (trial court may determine jury is hopelessly deadlocked warranting a mistrial, even without first delivering jury deadlock charge); *Dunne v. Carey*, 97 N.H. 43, 45-46, 79 A.2d 842, 844 (1951). The trial court's instructions to the jury, however, must accurately state the law, and we review a challenged jury instruction "in the context of the court's entire charge." *State v. Fitanides*, 141 N.H. 352, 354, 683 A.2d 534, 536 (1996).

A trial court's aid to the jury deliberation process is not *per se* impermissible provided the court does not "set the tone of the deliberations by directing the jury down a path towards a guilty verdict[;] . . . [a]ny such direction to the jury, *however subtle*, denies the defendant an impartial jury." *State v. Surette*, 130 N.H. 531, 535, 544 A.2d 823, 825 (1988) (emphasis added); *cf. State v. Wood*, 132 N.H. 162, 165, 562 A.2d 1312, 1314 (1989) (court did not improperly interfere with deliberative process by suggesting that jury discard evidence it did not believe before deliberating on elements of charge). In addition, the court's instruction cannot "be of a coercive nature that would improperly sway a jury to reach a unanimous verdict." *Silva*, 142 N.H. at 274, 699 A.2d at 594.

In determining whether jury instructions are coercive, we adopt a four-factor test; namely, we review: (1) the content of the instruction; (2) the length of deliberations after the challenged charge; (3) the total length of deliberations; and (4) any indicia in the record of coercion or pressure upon the jury. *See, e.g., United States v. Johnson*, 114 F.3d 808, 815 (8th Cir. 1997); *United States v. Cortez*, 935 F.2d 135, 141-42 (8th Cir. 1991), *cert. denied*, 502 U.S. 1062 (1992); *United States v. Wauneka*, 842 F.2d 1083, 1088 (9th Cir. 1988). The last factor encompasses, *inter alia*: whether the judge knows the numerical division of the jurors' split before giving the instruction; the time the jury has deliberated without a break; the frustration level of the jury for failing to reach a verdict; and the jury's general physical condition. *Cf. Johnson*, 114 F.3d at 815. We review each factor in turn.

First, we conclude that the challenged instruction was potentially coercive, and had the capability of improperly interfering with the deliberative process. The charge on its face essentially instructed each juror to articulate the reasoning of the position held by opposing jurors, and then decide whether deliberations should continue. In its instruction, however, the trial court failed to anticipate and account for the possibility that the margin of the apparent deadlock was substantial, *e.g.*, eleven jurors voting guilty and one lone juror voting not guilty or displaying serious reservation. In that instance, the lone juror, as a captive audience, would be compelled to listen to the others characterize and recharacterize his or her opposing position eleven times. At some point, this compelled process could serve to intimidate, or even coerce, the lone juror into acquiescing under the weight of the overwhelming majority. *Cf. Jordan*, 130 N.H. at 50, 534 A.2d at 379 (proper instruction to advert possibility of unnecessary jury deadlock directs jurors to reconsider their individual positions but not to "surrender [their] honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors"); *Silva*, 142 N.H. at 274, 699 A.2d at 594 (jury deadlock instruction was not coercive where court asked jury to use its best efforts to determine whether State met its burden because a mistrial would likely result in a retrial). Consequently, the judge's instruction could have served to improperly permit a potential majority position favoring a guilty verdict to prevail, regardless of the strength and merits of the minority position.

The State argues that the judge's pre-deliberation instructions cautioned the jurors not to compromise their individual viewpoints. *See Fitanides*, 141 N.H. at 354, 683 A.2d at 536 (challenged jury

instruction reviewed on appeal in context of court's entire charge). Specifically, the State points to the following instruction:

> Your verdict must be unanimous. That is, it must be the verdict of each and every one of you. Make sure when the foreperson comes back here in the courtroom to announce your verdict that it is the verdict of each and every one of you. Don't engage in any gamesmanship. Don't just say if we can get ten votes the other two will agree to go along. Make sure the verdict you come back into the courtroom with is a unanimous verdict.

This instruction, however, emphasizes the unanimity requirement of verdicts and neither addresses the potential coercive effect of a majority nor instructs jurors not to compromise their honest convictions. Thus, we are not persuaded that the initial charge remedied the potential coercive effect of the charge at issue. We must, however, review the remaining factors to determine whether the instruction indeed coerced the jury in this case.

A review of the second factor, the length of the deliberations after the supplemental instruction, demonstrates that the jury was not coerced. After the judge gave the challenged instruction, the jury deliberated an additional five and one-half hours, over two days, before reaching a guilty verdict. In fact, following an overnight recess and two and one-half hours of deliberations after the supplemental instruction, the jury sent a note to the judge, *again* announcing its inability to reach a decision. After this second indication of deadlock, the judge did not repeat the challenged instruction, but simply told the jury to continue working. This second announcement indicates that any minority that may have existed at the time the judge issued the supplemental charge was not coerced into a guilty verdict.

Moreover, following the second deadlock announcement, the jury continued deliberating for approximately three and one-half hours before reaching a unanimous verdict. During that time, yet another inquiry came from the jury. While the record is unclear whether that inquiry involved deadlock, it tends to reinforce the impression that the jury continued serious deliberations well after the allegedly coercive supplemental charge at issue. We conclude that the length of the post-supplemental charge deliberations, as well as the subsequent indication of deadlock and additional inquiry, suggest that the jury was not coerced by the supplemental instruction.

The third factor, total length of deliberations, also reveals lack of coercion. The trial lasted three and one-half days and the jury

deliberated for approximately twelve hours over a two and one-half day period. Where the difference between the length of trial and length of deliberations is disproportionate, we worry about coercion resulting from the instruction. *See Johnson*, 114 F.3d at 815. We conclude, however, that the difference between the length of trial and length of deliberations in this case is not so disproportionate as to support an inference of coercion. *Id.* (citing examples).

Finally, no other indicia of coercion are present. Concerning the supplemental charge at issue, the judge did not inquire into the jury's numerical division prior to giving the supplemental instruction. Further, after giving the supplemental instruction, the judge gave the jury the option of continuing deliberations or suspending its efforts until the following day. Moreover, the judge provided the jury a break about every two hours, except on one occasion when the jury deliberated without a break for, at most, three hours and twenty minutes. Nothing in the record indicates that the jury was overly tired, hungry, frustrated, refused a break, or otherwise under duress at any time during the deliberations.

■ Accordingly, while the supplemental instruction was potentially coercive and intrusive of the jury deliberation process, we conclude on the record before us that the jury was not coerced to render a guilty verdict. We caution the trial court, however, to exercise its broad discretion carefully in fashioning a response to a jury's indication of deadlock, especially when crafting its own language independent of the model established in *Jordan*. *See Jordan*, 130 N.H. at 50, 534 A.2d at 379.

■ While neither party raised the issue on appeal, *see Silva*, 142 N.H. at 271-72, 699 A.2d at 593, we note that the trial judge entered the jury deliberation room with counsel to give further instructions. The jury room is sacrosanct, and neither the judge nor counsel should invade the jury's domain. *See Boynton v. Trumbull*, 45 N.H. 408, 410 (1864) (sheriff's presence in jury room during deliberations is manifestly improper); *cf. Donahoo v. State*, 371 So. 2d 75, 78-79 (Ala. Crim. App. 1979) (to preserve sanctity of jury room, any communication between judge and jury after submission of case must occur in open court); *State v. Mims*, 235 N.W.2d 381, 387-88 (Minn. 1975) (judge's uninvited entry into sanctity of jury room offends integrity of proceedings and risks influencing deliberative process). Trial courts have the obligation to scrupulously protect the sanctity of the jury room, *cf. Silva*, 142 N.H. at 271-72, 699 A.2d at 593, and for the future, we direct that no face-to-face communica-

tions between the judge and the jury prior to the verdict occur in the jury room absent extraordinary circumstances.

*Affirmed.*

All concurred.